IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| MONIQUE MESSENGER and KEVIN MESSENGER, wife and husband, individually and on behalf of their minor children, M.M., G.M., L.M., B.M., and Q.M., | No. 80639-4-I |
| | DIVISION ONE |
| Appellants, | OPINION PUBLISHED IN PART |
| v. | |
| SHANNON L. WHITEMARSH, as Administrator-Personal Representative of THE ESTATE OF BRYAN DONALD WHITEMARSH; and MULTICARE HEALTH SYSTEM, a Washington nonprofit corporation, | |
| Respondents. | |

CHUN, J. — The Messenger family brought a medical malpractice suit against the estate of Bryan Whitemarsh, MD (Estate), and they also sued Whitemarsh's former employer, MultiCare Health System. The family claimed damages arising from a sexual relationship between Whitemarsh and his patient, Monique Messenger. The trial court granted the defendants' motions for summary judgment. The Messengers appeal.

In the published portion of this opinion, we hold that a primary care physician who provides mental health services to a patient may be liable for malpractice for injuries arising from the doctor's sexual relationship with that

patient. We also conclude that the Messengers established genuine issues of material fact as to whether Whitemarsh treated Monique's[1] mental health issues and as to whether the sexual relationship constituted breach of duty.

In the unpublished portion of this opinion, we conclude that the trial court properly granted summary judgment as to the Messengers' claims against MultiCare for negligent supervision or training and negligent hiring or retention.

As a result, we affirm in part and reverse in part.

## I. BACKGROUND

From about 2010 to 2016, Whitemarsh acted as the Messenger family's primary care physician. In August 2015, Monique and Whitemarsh began an extramarital sexual relationship. Monique claims that before and during the affair, Whitemarsh treated her for depression. Kevin, Monique's husband, eventually discovered the affair and confronted her with his knowledge. In June 2016, Whitemarsh and Monique met and ended their relationship; Monique alleges that during their meeting, Whitemarsh threatened to kill her, Kevin, and himself. Whitemarsh committed suicide at home later that evening.

The Messenger family sued the Estate for medical malpractice, claiming Whitemarsh violated his duty of care to Monique by engaging in a sexual relationship with her. The Messengers also sued Whitemarsh's former employer, MultiCare, for vicarious liability and negligence.

The Estate and MultiCare moved for summary judgment. The Messengers moved to continue the summary judgment hearing, which motion

---

[1] For clarity, we use the Messengers' first names. We intend no disrespect.

the trial court denied. Before the hearing, the Messengers moved to amend their complaint, requesting inclusion of a breach of fiduciary duty claim and a negligent infliction of emotional distress claim against the Estate and MultiCare. The trial court granted the Estate's and MultiCare's motions for summary judgment and denied leave to amend. The Messengers appeal.

## II. ANALYSIS

### A. Standard of Review

We review de novo summary judgments. Strauss v. Premera Blue Cross, 194 Wn.2d 296, 300, 449 P.3d 640 (2019). "Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Strauss, 194 Wn.2d at 300 (internal ellipsis, internal quotation marks and citation omitted); CR 56(c). We must construe all facts and inferences in favor of the nonmoving party. Scrivener v. Clark College, 181 Wn.2d 439, 444, 334 P.3d 541 (2014). "A genuine issue of material fact exists when reasonable minds could differ on the facts controlling the outcome of the litigation." Dowler v. Clover Park Sch. Dist. No. 400, 172 Wn.2d 471, 484, 258 P.3d 676 (2011).

### B. Medical Malpractice Claim Against the Estate

The Messengers argue that any physician who engages in a sexual relationship with their patient, as Whitemarsh did with Monique, commits medical malpractice under RCW 7.70. They alternatively claim that, because Whitemarsh provided Monique with mental health treatment, their sexual relationship constituted medical malpractice under RCW 7.70. The Estate

argues Whitemarsh's conduct is non-actionable under RCW 7.70, because (1) primary care physicians are not subject to RCW 7.70 liability for sexual relationships with patients and (2) no admissible evidence establishes that Whitemarsh provided Monique with mental health treatment. We conclude that the Messengers have established a genuine issue of material fact as to whether Whitemarsh treated Monique's mental health issues. We also conclude that a primary care physician who provides mental health treatment to a patient may be subject to malpractice liability for engaging in a sexual relationship with that patient, and that the Messengers have established a genuine issue of material fact as to whether Whitemarsh breached his duty to Monique.[2]

    1.  Evidence of mental health treatment

        a.  Medical records

In Monique's November 8, 2012 medical record, Whitemarsh noted that Monique had an "[a]djustment disorder with depressed mood," "has been feeling ok," "continues to have difficulty with her separation with her husband," "has periods of depression," and "has been seeing a counselor." He also noted that her "mood [is] ok," "affect [is] anxious," "[t]hought process [is] logical and linear without loosening of associations or flight of ideas," that her "[t]hought content [is]

---

[2] Throughout their briefing, the Messengers claim that Whitemarsh violated his fiduciary duty to Monique. In a footnote in their reply brief, the Messengers argue that "it is also doubtful whether a separate cause of action for breach of fiduciary duty against a physician is still viable in light of the Legislature's decision to reclassify '*all* civil actions for damages for injury occurring as a result of health care, *regardless of how the action is characterized*' under RCW 7.70." The trial court denied the Messengers' motion to amend their complaint to include claims for breach of fiduciary duty and negligent infliction of emotional distress. The appellants do not assign error to that ruling.

normal," that she "[d]enies suicidal or homicidal ideation," and that she "[d]enies audio or visual hallucinations." Finally, he notes that Monique should "continue counseling." When viewing this evidence in the light most favorable to the Messengers, one could reasonably conclude that Whitemarsh provided Monique with mental health services. Thus, the medical records establish a genuine issue of material fact that Whitemarsh treated her mental health issues.

   b. Monique's declaration and deposition; dead man's statute

Monique's declaration and deposition testimony also establish a genuine issue of material fact as to whether Whitemarsh treated her mental health issues. In her declaration, Monique claimed that Whitemarsh offered to prescribe her antidepressants and counseled her for depression. In her deposition, she stated that Whitemarsh had spoken to her about her postpartum depression, asked questions about how she felt, and offered to prescribe her antidepressants. Viewing this evidence in the light most favorable to the Messengers, one could reasonably conclude that Whitemarsh provided Monique with mental health services.

The Estate argues that the trial court properly applied the dead man's statute to bar this evidence. "The [dead man]'s statute, RCW 5.60.030, bars testimony by a 'party in interest' regarding 'transactions' with the decedent or statements made to [them] by the decedent." Estate of Lennon v. Lennon, 108 Wn. App. 167, 174, 29 P.3d 1258 (2001). Assuming without deciding that the dead man's statute would normally bar Monique's declaration and deposition, we conclude that the Estate waived the statute's protections by introducing

5

Monique's medical records. Thus, the Messengers may introduce Monique's declaration and deposition if they rebut evidence of Monique's visits to Whitemarsh that are present in the introduced medical records.

We review de novo the admissibility of evidence in summary judgment proceedings. Parks v. Fink, 173 Wn. App. 366, 375, 293 P.3d 1275 (2013). Introduction of documents written or executed by the deceased, including medical records, does not typically waive the protections of the dead man's statute. Erickson v. Robert F. Kerr, M.D., P.S., Inc., 125 Wn.2d 183, 188–89, 883 P.2d 313 (1994). In Erickson, the Erickson estate introduced the decedent patient Erickson's medical records, written by the doctor against whom they asserted medical malpractice. 125 Wn.2d at 187. Our Supreme Court determined that the Erickson estate did not waive the protections of the dead man's statute because the records were made contemporaneous with treatment, made in the doctor's usual course of business, and were not self-serving to the estate, since they were not written by the party offering them. Erickson, 125 Wn.2d at 189. The court reasoned that the "objective nature of such records made prior to any motive for fabrication obviates the statute's protection against self-serving statements." Erickson, 125 Wn.2d at 188.

By contrast, in Bentzen v. Demmons, the personal representative of his deceased aunt's estate submitted an affidavit in which he asserted that he knew of no oral agreement between his aunt and Bentzen to bequeath her assets to Bentzen. 68 Wn. App. 339, 343–44 n.2, 842 P.2d 1015 (1993). The trial court had ruled that the protections of the dead man's statute barred contrary

testimony from Bentzen. Bentzen, 68 Wn. App. at 343. The appellate court held that, by saying his aunt never told him of an oral agreement between her and Bentzen, the personal representative waived the dead man's statute's protections, since he effectively introduced evidence about a transaction with the deceased. Bentzen, 68 Wn. App. at 345–46.

Here, in moving for summary judgment, the Estate offered Monique's medical records to counter the Messengers' assertion that Whitemarsh provided Monique with mental health treatment. The record from Monique's February 3, 2016 visit is self-serving to the Estate in that it omits the sexual relationship with Monique. In the record, Whitemarsh wrote that Monique had a "[s]ingle current partner for past 7 months/years[,]" presumably referring to her husband Kevin. But the inception of his affair with Monique predated that visit by at least five months, so this entry was false. The medical records are also self-serving to the Estate in that they present little to no evidence that Whitemarsh treated Monique's mental health issues, save for the November 8, 2012 record. After beginning a sexual relationship with Monique, Whitemarsh had reason to fabricate the records, and minimize the fact of any possible mental health treatment he provided to Monique; he may have engaged in such fabrication, as shown by his entry on the February 3, 2016 record. The records may also minimize his treatment of her mental health issues because of their sexual relationship. Additionally, unlike in Erickson, where the medical records' proponent (the estate of the patient) did not author them, so they were not self-serving, here, the Estate introduced documents written by Whitemarsh, so the

7

records are self-serving. We conclude the Estate has waived the dead man's statute's protections by introducing the medical records.[3]

Once the party protected by the dead man's statute has waived its protections, the interested party may rebut the evidence that waived the statute's protections. Bentzen, 68 Wn. App. at 345. "However, waiver by introduction of testimony about one transaction does not extend to unrelated transactions and conversations." Bentzen, 68 Wn. App. at 345.

Thus, the Messengers may introduce Monique's statements only if they rebut the evidence in the medical records. Most of the records show no evidence of mental health treatment; Monique's declaration and deposition, in which she claims Whitemarsh provided her with such treatment, rebut the medical records.

Because the Messengers have established a genuine issue of material fact as to whether Whitemarsh provided Monique with mental health treatment, we need not reach the issue of whether *any* physician who engages in a sexual

---

[3] Because Whitemarsh signed many of Monique's medical records on a later date than her visits, it is unclear whether Whitemarsh made the records contemporaneous with Monique's visits. Whitemarsh signed the record for Monique's November 8, 2012 visit on November 12, 2012; he signed the record for Monique's May 21, 2013 visit on June 2, 2013; he signed the record for Monique's September 11, 2013 visit on September 25, 2013; and he signed the record for Monique's February 3, 2016 visit on February 10, 2016. But Whitemarsh signed the record for Monique's October 9, 2014 visit on the same day, and he signed the record for Monique's July 15, 2015 visit on the same day.

Whitemarsh's medical assistant signed the records corresponding to Monique's May 21, 2013 visit and her February 3, 2016 visit on the day of the visits, suggesting the records may have been created on May 21 and February 3, even if Whitemarsh did not sign them until later. Various orders and prescriptions are listed as "signed" on the day of the visit for the records corresponding to the November 8, 2012 visit, the May 21, 2013 visit, and the September 11, 2013 visit, also suggesting the office created the records on the day of the visit, even if Whitemarsh signed them later. While contemporaneity is unclear, we still conclude the Estate waived the dead man's statute's protections because the records are self-serving to the Estate.

8

relationship with a patient commits malpractice. Instead, we analyze whether a primary care physician who provides mental health services to a patient commits malpractice by engaging in a sexual relationship with that patient.

2. Actionability

In Washington, to sustain a medical malpractice claim based on a failure to follow an accepted standard of care, a plaintiff must establish these elements:

> (1) The health care provider failed to exercise that degree of care, skill, and learning expected of a reasonably prudent health care provider at that time in the profession or class to which [they belong], in the state of Washington, acting in the same or similar circumstances;
>
> (2) Such failure was a proximate cause of the injury complained of.

RCW 7.70.040. RCW 7.70 provides the exclusive remedy for damages for injuries resulting from health care. Branom v. State, 94 Wn. App. 964, 968–69, 974 P.2d 335, review denied, 138 Wn.2d 1023, 989 P.2d 1136 (1999).

RCW 7.70 limits recovery to instances in which injury occurs as the result of health care. See RCW 7.70.010 ("Declaration of modification of actions for damages based upon injuries resulting from health care"), .030 ("No award shall be made in any action or arbitration for damages for injury occurring as the result of health care . . . unless the plaintiff establishes one or more of the following propositions . . ."); Branom, 94 Wn. App. 968–69. Health care is "the process in which a physician is utilizing the skills which [they] had been taught in examining, diagnosing, treating, or caring for the plaintiff as [their] patient," and "[t]he prevention, treatment, management of illness and the preservation of mental and physical well-being through the services offered by the medical and allied health

9

professions." Branom, 94 Wn. App. at 969–70 (internal quotation marks, brackets and citations omitted).

Washington cases have not yet answered the question of whether a primary care physician who provides mental health services to a patient may be liable under RCW 7.70 for engaging in a sexual relationship with that patient.[4] Some Washington cases favorably recognize decisions adopting the view that such conduct by a psychologist or mental health therapist can support a malpractice claim. See Am. Home Assur. Co. v. Cohen, 124 Wn.2d 865, 872, 881 P.2d 1001 (1994) ("[M]ost courts which have considered the issue have ruled that sexual or erotic contact with a client is 'malpractice' or 'professional negligence' on the part of a psychologist or other mental health therapist."); see also Washington Ins. Guar. Ass'n v. Hicks, 49 Wn. App. 623, 627, 744 P.2d 625 (1987) (recognizing that malpractice insurance coverage has been allowed in cases of sexual contact between a mental health therapist or psychiatrist and a patient) (citing Simmons v. United States, 805 F.2d 1363, 1365 (9th Cir. 1986) (describing the scope of when a mental health therapist or psychiatrist may be liable in malpractice for sexual contact with a patient)). And in Simmons, the Ninth Circuit stated that "[t]here is no question that a mental health professional's sexual involvement with a client is a breach of duty and malpractice under Washington law." 805 F.2d at 1368 (citing Omer v. Edgren, 38 Wn. App. 376,

---

[4] Washington law, however, provides that a physician's sexual contact with a patient constitutes unprofessional conduct. See RCW 18.130.180(24); WAC 246-16-100(1); see also, Haley v. Medical Disciplinary Bd., 117 Wn.2d 720, 735–36, 738, 818 P.2d 1062 (1991) (holding that a doctor's sexual relationship with a juvenile former patient demonstrated unfitness to practice medicine warranting professional discipline).

379, 685 P.2d 635 (1984) (determining a patient has a cause of action against a psychiatrist with whom the patient had a sexual relationship, because the psychiatrist breached his fiduciary duty to the patient)).

In Cohen, our Supreme Court characterized Omer as follows: "the Court of Appeals held that a patient of a psychiatrist had a cause of action for damages based on the psychiatrist's sexual contact with her." 124 Wn.2d at 872 n.10. The Cohen court declined to embrace Omer and stated that "[the Washington Supreme Court] has not determined whether sexual misconduct by psychologists is malpractice and we do not decide that issue in this case." 124 Wn.2d at 872. Notably, neither Cohen nor Omer analyzed this issue in the context of RCW 7.70, but in the insurance and fiduciary duty contexts, respectively.

Non-Washington cases provide some guidance. Some courts have held that a psychiatrist or mental health therapist commits malpractice if they mishandle the "transference phenomenon" and enter into a sexual relationship with the patient.[5] The term "transference" denotes how a mental health patient develops emotions toward and projects feelings onto their therapist. Simmons, 805 F.2d at 1364.[6] Such feelings may be inappropriate, and either hostile or loving. Simmons, 805 F.2d at 1365. "Understanding of transference forms a basic part of the psychoanalytic technique," and mental health professionals are

---

[5] See, e.g., Simmons, 805 F.2d at 1364–66.

[6] While the Ninth Circuit decided Simmons almost 34 years ago, courts continue to cite its observations on the transference phenomenon. See, e.g., Gregg v. Hawaii, Dep't of Pub. Safety, 870 F.3d 883, 888 n.2 (2017); Thierfelder v. Wolfert, 617 Pa. 295, 324–25, 52 A.3d 1251 (2012); Doe v. Harbor Sch., Inc., 446 Mass. 245, 259 n. 16, 843 N.E.2d 1058 (2006); Darnaby v. Davis, 57 P.3d 100, 103 (Okla. Civ. App. 2002).

trained to recognize and counteract the transference phenomenon. Simmons, 805 F.2d at 1365. "The proper therapeutic response is countertransference, a reaction which avoids emotional involvement and assists the patient in overcoming problems." Simmons, 805 F.2d at 1365. But when a mental health therapist "mishandles transference and becomes sexually involved with a patient, medical authorities are nearly unanimous in considering such conduct to be malpractice." Simmons, 805 F.2d at 1365. Misuse of transference and therapist-patient sex is "psychologically deleterious for the involved . . . patient." Simmons, 805 F.2d at 1365 (quoting Virginia Davidson, Psychiatry's Problem with No Name: Therapist-Patient Sex, 37 AM. J. PSYCHOANALYSIS 43, 48-49 (1977)).

Some courts have concluded that health care providers who provide some mental health services—not just psychiatrists or mental health therapists—may also commit malpractice by engaging in a sexual relationship with a patient. For example, in McCracken v. Walls-Kaufman, the court reasoned that:

> [I]f a medical professional not practicing in the field of mental health enters into a relationship of trust and confidence with a patient and offers counseling on personal matters to that patient, thus taking on a role similar to that of a psychiatrist or psychologist, that professional should be bound by the same standards as would bind a psychiatrist or psychologist in a similar situation.

717 A.2d 346, 352 (D.C. 1998) (citing Dillon v. Callaway, 609 N.E.2d 424, 428 (Ind. Ct. App. 1993) (holding a plaintiff's injuries "arose from the rendition of health care" where their primary care physician mishandled transference and entered into sexual relationship with them); Shamloo v. Lifespring, Inc., 713 F. Supp. 14, 17, (D.D.C. 1989) ("[District of Columbia] case law does not hold that

an unlicensed purveyor of 'professional' psychological services should be afforded greater protection from claims of negligence or malpractice than a licensed one."); Correll v. Goodfellow, 255 Iowa 1237, 1244, 125 N.W.2d 745, 749 (1964) (holding a chiropractor to a medical doctor's standard of care where he went outside standard chiropractic techniques and administered ultra-sonic treatments to plaintiff)). The court thus held that a chiropractor[7] could be liable for medical malpractice if (1) they engaged in sexual acts with a patient, (2) during their chiropractic treatment of the patient, a relationship like a psychologist-patient relationship developed, (3) that it breached the applicable standard of care for the doctor to engage in such acts with their patient, and (4) that the breach proximately caused the plaintiff's injuries. McCracken, 717 A.2d at 352–53.

Similarly, in Darnaby v. Davis, 57 P.3d 100, 106–07 (Okla. Civ. App. 2002), the court held that a general practitioner who treated a patient for mental health issues could be liable in malpractice for engaging in a sexual relationship with their patient. The court recognized that transference is a treatment tool commonly used by psychiatrists and mental health therapists, and where such a practitioner misuses transference to enter a sexual relationship, they commit malpractice. Darnaby, 57 P.3d at 106. From such, the court held that, because transference is a form of treatment, if transference "was wielded and mishandled

---

[7] While we view McCracken as helpful to our analysis, we note that we limit our holding to primary care physicians who treat mental health issues. We observe that, unlike the defendant chiropractor in McCracken, mental health lies within the typical range of care for a primary care physician like Whitemarsh.

not by a psychologist, psychiatrist, or other therapist, but by a general practitioner who, through [their] actions effectively took on the role of a mental health care provider," that a general practitioner could also be liable in malpractice. Darnaby, 57 P.3d at 106.

By some contrast, in Thierfelder v. Wolfert, 617 Pa. 295, 341, 52 A.3d 1251 (2012), the Pennsylvania Supreme Court concluded that primary care physicians who provide mental health services have no *absolute* duty to refrain from sexual relationships with patients. But the case apparently leaves the door open for malpractice liability for such conduct in some instances.

As to the legal question before us, guided by the authorities discussed above, we conclude that a primary care physician who provides mental health services to a patient may be liable in malpractice for injuries arising from the doctor's sexual relationship with that patient. Such liability may attach when, in the course of such treatment, transference and a mishandling of that transference occurs, causing injuries as a result of health care under the meaning of RCW 7.70. Given this conclusion, we next address the Messengers' argument that they have established a genuine issue of fact on whether Whitemarsh breached his duty to Monique.

3.      Evidence of breach of duty

It is undisputed that Whitemarsh had been Monique's doctor for at least several years before he began a sexual relationship with her. And as discussed above, medical records show that, as early as 2012, Monique shared with Whitemarsh intimate, personal details of her life, including her depression and

14

marital problems. According to Monique, Whitemarsh counseled her for postpartum depression and offered to prescribe her antidepressants. Their sexual relationship arose out of this purported therapeutic milieu in which Whitemarsh arguably held a position of trust and confidence.

Furthermore, the Messengers submitted a declaration from Howard B. Miller, MD, in support of their claim. The trial court struck the declaration because it considered the question before it purely legal, and not factual. The Messengers argue the trial court erred in striking the declaration. We review de novo evidentiary rulings made in summary judgment proceedings. Parks, 173 Wn. App. at 375.

Expert testimony typically establishes the applicable standard of care in a medical malpractice action. Reagan v. Newton, 7 Wn. App. 2d 781, 790–91, 436 P.3d 411 (2019). "The expert testimony must establish what a reasonable medical provider would or would not have done under the circumstances, that the defendant failed to act in that manner, and that this failure caused the plaintiff's injuries." Reagan, 7 Wn. App. 2d at 791. In the absence of such expert testimony, the defendant is entitled to summary judgment. Reagan, 7 Wn. App. 2d at 791.

In his declaration, Miller asserted that Whitemarsh breached the applicable standard of care by engaging in a sexual relationship with Monique. Miller claimed that Whitemarsh gained familiarity with the intimate details of the lives of Monique, Kevin, and their children, and exploited the confidence he earned with Monique "to create a situation of influence and unequal power over

her which he used in a manner that resulted in the sexual relationship." Miller also asserted that Whitemarsh risked worsening Monique's mental health issues by engaging in a sexual relationship with her while counseling her for depression and caused her harm by doing so. Miller's declaration establishes what a reasonable medical provider would not have done under the circumstances, and that Whitemarsh failed to act in that manner, causing Monique's injuries. The trial court erred in striking the whole declaration, much of which provides proper expert opinion on factual matters.[8]

When viewing the evidence provided—including Miller's declaration, the fact that Whitemarsh provided Monique mental health treatment, and the undisputed fact that a sexual relationship occurred between the two in the light most favorable to the Messengers—one could reasonably find that transference occurred, leading to their sexual relationship. The Messengers have established a genuine issue of material fact as to whether Whitemarsh breached the applicable standard of care by engaging in a sexual relationship with Monique.

In sum, we conclude that a sexual relationship between a patient and a primary care physician who provides mental health treatment may constitute malpractice. We also conclude that the Messengers established a genuine issue of material fact that Whitemarsh provided Monique with mental health treatment

---

[8] The Estate argues that the trial court properly struck Miller's declaration because Washington law does not recognize liability for sexual relationships between doctors and patients. But this runs contrary to our analysis above regarding primary care physicians. The Estate also argues the trial court properly struck the declaration because it includes inadmissible testimony from Monique that Whitemarsh provided her with mental health treatment. But as we conclude above, Monique's testimony is admissible if it contradicts her medical records.

16

and that the Messengers established a genuine issue of material fact that Whitemarsh breached the applicable standard of care.[9]  For these reasons, we reverse the summary judgment ruling for the Estate and remand for further proceedings consistent with this opinion.[10]

The panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder having no precedential value will be filed for public record under RCW 2.06.040, it is so ordered.

Unpublished Text Follows

C. Negligence Claims Against MultiCare

The Messengers argue the trial court erred in dismissing on summary judgment their negligent hiring or retention and negligent training or supervision claims against MultiCare.  We disagree.

An employer may be liable for the torts committed by employees who act outside the scope of their employment if the employer is negligent in hiring or retention or negligent in training or supervision.  Evans v. Tacoma Sch. Dist. No. 10, 195 Wn. App. 25, 47, 380 P.3d 553 (2016).[11]

---

[9] In their reply brief, the Messengers also argue that by threatening to kill Monique and Kevin, Whitemarsh breached his duty under RCW 7.70.  But an issue raised and argued for the first time in a reply brief is too late to warrant consideration. Cowiche Canyon Conservancy v. Bosley, 118 Wn.2d 801, 809, 828 P.2d 549 (1992). Thus, we do not consider the Messengers' argument that the threats constituted breach.

[10] Because we reverse the grant of the Estate's summary judgment motion, we need not consider whether the trial court erred in denying the Messengers' motion to continue the summary judgment hearing as to the Estate.

[11] The trial court dismissed the plaintiffs' vicarious liability claim.  The Messengers do not argue here that Whitemarsh committed torts within the scope of his employment.

In support of their negligence claims, the Messengers point to a 2006 complaint against Whitemarsh. The complaint led to an investigation by the Medical Quality Assurance Commission (MQAC). MQAC concluded no proof showed that Whitemarsh violated any professional rules or regulations and thus deemed professional discipline unnecessary.[12]

The Messengers also claim that Whitemarsh had a romantic relationship with one of his coworkers, who once saw Monique and Whitemarsh together at the clinic after hours. Whitemarsh and the coworker also wrote each other prescriptions. The coworker stated in a Facebook message to Monique that she would not have reported Whitemarsh had she discovered Monique and Whitemarsh's relationship, though later in her deposition, she said she would report it if she found out a health care provider had an inappropriate relationship with a patient.[13] The Messengers also note that Monique alleged, in a portion of her declaration stricken by the trial court on grounds of the dead man's statute, that Whitemarsh made sexual comments to her in the presence of his medical assistant. From such, they claim that MultiCare fostered a "culture of impropriety."

---

[12] The record does not include the patient complaint. But it includes a letter to Whitemarsh from MQAC closing the investigation.

[13] The following is an excerpt from Monique and the MultiCare employee's Facebook communications:

> Monique: I often asked him if you were such good friends and nothing more, why he wouldn't share [the fact of our relationship] with you. He said he was afraid of losing his job.
>
> [MultiCare employee]: Shit. Like I would do that. He knew better[.]

Finally, the Messengers claim that MultiCare offered no evidence that it provides training to its employees on sexual misconduct. The Messengers do not make clear which evidence supports which negligence claim.

1. Negligent hiring or retention

An employer may be liable for negligent hiring or retention when they fail to exercise ordinary care by hiring or retaining an employee known to be unfit. Evans, 195 Wn. App. at 46. "[T]o hold an employer liable for negligently hiring or retaining an employee who is incompetent or unfit, a plaintiff must show that the employer had knowledge of the employee's unfitness or failed to exercise reasonable care to discover the unfitness before hiring or retaining the employee." Anderson v. Soap Lake Sch. Dist., 191 Wn.2d 343, 356, 423 P.3d 197 (2018). "Negligent hiring occurs at the time of hiring, while negligent retention occurs during the course of employment." Anderson, 191 Wn.2d at 356.

MultiCare claims it did not know of the 2006 patient complaint filed against Whitemarsh until after his death. The Messengers assert MultiCare knew or should have known about the complaint, since it was a "publicly available complaint made to the Board of Health." The Messengers reference neither the record nor the law to support this assertion. Nor do they provide the complaint, which is not in the record. Monique and Miller's declarations assert the complaint regards alleged sexual misconduct, but their assertions lack adequate factual support. Guile v. Ballard Comty. Hosp., 70 Wn. App. 18, 25, 851 P.2d 689 (1993) ("Affidavits containing conclusory statements without adequate factual

support are insufficient to defeat a motion for summary judgment."); <u>see also</u> <u>Seven Gables Corp v. MGM/UA Entm't Co.</u>, 106 Wn.2d 1, 13, 721 P.2d 1 (1986) ("A nonmoving party in a summary judgment may not rely on speculation . . . or in having its affidavits considered at face value."). The letter from MQAC closing the 2006 investigation reveals nothing regarding the substance of the complaint or otherwise show that MultiCare knew Whitemarsh was unfit or that MultiCare failed to exercise reasonable care to discover his unfitness. No evidence shows that MultiCare knew or should have known about the complaint.

Neither do the facts supporting the Messengers' assertion that MultiCare fostered a "culture of impropriety" establish that MultiCare knew of Whitemarsh's unfitness or failed to use reasonable care to discover it.

First, since Monique's testimony about Whitemarsh making sexual comments to her in the presence of his medical assistant concerns a transaction with Whitemarsh, and does not rebut the contents of her medical records, it appears to have been properly stricken on grounds of the dead man's statute.

Second, even if all the evidence of the "culture of impropriety" were admissible, an employee's knowledge of their fellow employee's characteristics of unfitness cannot be imputed to the employer unless the employee has a duty to report such knowledge. <u>See</u> <u>Peck v. Siau</u>, 65 Wn. App. 285, 291–292, 827 P.2d 1108 (1992) (concluding that a teacher's knowledge of a fellow educator's inappropriate contact with a student would not be imputed to the school district, where the teacher had no supervisory authority over the educator or any administrative responsibilities for the district). Here, the Messengers have not

established that the employees at issue had such a duty, so even assuming their knowledge demonstrated Whitemarsh's unfitness, we cannot impute such knowledge to MultiCare.

Finally, the Messengers assert that MultiCare presented no evidence of training provided to employees to prevent sexual misconduct. But this does not demonstrate that MultiCare knew or failed to exercise reasonable care to discover Whitemarsh's unfitness. The assertion also ignores that the Messengers bear the burden of proof on their claim. The negligent hiring or retention claim fails.

2.  Negligent training or supervision

To establish a claim for negligent training or supervision, the Messengers must show that MultiCare knew, or should have known in the exercise of reasonable care, that Whitemarsh posed a risk to others, and that MultiCare's failure to supervise proximately caused their loss. Garrison v. Sagepoint Fin., Inc., 185 Wn. App. 461, 484, 345 P.3d 792 (2015).

Washington courts rely on the RESTATEMENT (SECOND) OF TORTS (1965) to determine whether an employer knew or should have known in the exercise of reasonable care that an employee posed a risk to others:

> " 'A master is under a duty to exercise reasonable care so [as] to control [their] servant while acting outside the scope of [their] employment as to prevent [them] from intentionally harming others or from so conducting [themselves] as to create an unreasonable risk of bodily harm to them, if
>
> (a) the servant
>
> (i) is upon the premises in possession of the master or upon which the servant is privileged to enter only as [their] servant, or

(ii) is using a chattel of the master, and

(b) the master

(i) knows or has reason to know that [they have] the ability to control [their] servant, and

(ii) *knows or should know of the necessity and opportunity for exercising such control.*' "

Anderson, 191 Wn.2d at 363 (internal quotation marks omitted) (quoting Niece v. Elmview Group Home, 131 Wn.2d 39, 51, 929 P.2d 420 (1997) (quoting Peck, 65 Wn. App. at 294 (quoting RESTATEMENT (SECOND) OF TORTS § 317 (1965)))). Washington courts interpret the knowledge element "to require a showing of knowledge of the dangerous tendencies of the *particular employee.*" Anderson, 191 Wn.2d at 364.

As mentioned above, the 2006 complaint is not in record. Without evidence of the complaint's substance, it does not establish a genuine issue of material fact as to whether MultiCare should have known of Whitemarsh's dangerous tendencies. And as addressed above, Monique and Miller's assertions in their declarations about the complaint's substance lack adequate factual support. And the letter from MQAC closing the 2006 investigation—which does not disclose the complaint—does not tend to show that MultiCare knew or should have known that Whitemarsh had any dangerous tendencies.

The Messengers argue that a "culture of impropriety" at the clinic enabled Messenger's actions, relying heavily on Whitemarsh's personal relationship with a fellow employee. But no evidence shows this employee had contemporaneous knowledge of the affair or the prior complaint against Whitemarsh. The fact that the employee witnessed Whitemarsh and Monique together after hours does not

establish that she knew of an inappropriate relationship between the two. And a romantic relationship between Whitemarsh and the MultiCare employee—if it existed—would differ wholly from a sexual relationship between Whitemarsh and a patient. Finally, that the two wrote each other prescriptions has no bearing on whether she knew of Whitemarsh's dangerous tendencies. Thus, no evidence shows she had any knowledge of Whitemarsh's dangerous tendencies.

Even so, as in our analysis of the Messengers' negligent hiring or retention claim, we do not impute this employee's knowledge of any dangerous tendencies to MultiCare. See Peck, 65 Wn. App. at 293 (holding likewise that an employee's knowledge of a fellow employee's dangerous tendencies cannot be imputed to the employer without a demonstration of duty to report). The same is true of any inappropriate comments Whitemarsh may have made to Monique in the presence of his medical assistant, were such testimony admissible.

Finally, that MultiCare offered no evidence of an anti-sexual misconduct training program is not reason to decide against it on summary judgment, since the Messengers bear the burden of proving that MultiCare negligently supervised or trained its employees.

We conclude that the Messengers have not established a genuine issue of material fact as to whether MultiCare knew or should have known of Whitemarsh's dangerous tendencies. The negligent training or supervision claim fails.[14]

_____

[14] The Messengers also submitted Miller's declaration to support their negligence claims. But the declaration does not advance either of the claims. The declaration alleges MultiCare knew or should have known of the 2006 complaint against

23

D. Motion to Continue

The Messengers argue the trial court erred when it denied their motion to continue the summary judgment hearing. We disagree.

The Messengers filed their lawsuit in March 2017. Just over a year later, the Messengers moved to continue the summary judgment hearing. The Messengers claimed they needed more time to depose Whitemarsh's widow, supervisor, co-worker, father-in-law, the sheriff's deputies who responded to Whitemarsh's suicide, other patients, a MultiCare corporate representative under CR 30(b)(6), and Department of Health complaint investigators. They also sought more document production from Whitemarsh's widow.

> A trial court may continue a summary judgment hearing where:
>
> Should it appear from the affidavits of a party opposing the motion that for reasons stated, [they] cannot present by affidavit facts essential to justify [their] opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

CR 56(f).

We review for abuse of discretion a trial court's CR 56(f) ruling. Mut. of Enumclaw Ins. Co. v. Patrick Archer Constr., Inc., 123 Wn. App. 728, 743–44, 97

---

Whitemarsh. But as addressed above, the complaint's absence from the record prevents us from concluding that its existence, or Monique or Miller's assertions about its contents, establish a genuine issue of material fact as to whether MultiCare knew or should have known of Whitemarsh's dangerous tendencies. The declaration also argues that if the MultiCare employee who saw Monique with Whitemarsh at the clinic after hours had known of the 2006 complaint, she would have reported Whitemarsh. Such speculation does not suffice to establish a genuine issue of material fact as to whether MultiCare knew or should have known of Whitemarsh's dangerous tendencies. See Cho v. City of Seattle, 185 Wn. App. 10, 20, 341 P.3d 309 (2014) ("In order to preclude summary judgment, an expert's affidavit must include more than mere speculation or conclusory statements.").

24

P.3d 751 (2004). A trial court abuses its discretion if it bases its decision on untenable grounds or reasons. West v. Seattle Port Comm'n, 194 Wn. App. 821, 834, 380 P.3d 82 (2016).

A judge properly denies a CR 56(f) motion if "(1) the moving party does not offer a good reason for the delay in obtaining the evidence; (2) the moving party does not state what evidence would be established through the additional discovery; or (3) the evidence sought will not raise a genuine issue of fact." West, 194 Wn. App. at 833–34.

The Messengers blame the opposing parties' delays in making Whitemarsh's supervisor and widow available for depositions as their reason for delay in obtaining such evidence. The Messengers give no similar reason for their failure to obtain the other evidence cited in their motion to continue.

The Messengers argue Whitemarsh's supervisor's testimony would be relevant to their negligent supervision claim because he supervised Whitemarsh and because he had a personal friendship with Whitemarsh. They claim his deposition could help establish MultiCare's training or supervision polices related to sexual relationships with patients and coworkers. The Messengers do not state what evidence a deposition of Whitemarsh's widow would establish.

As for the supervisor, the Messengers assert that the evidence they seek to obtain "would have raised a genuine issue of fact as to what MultiCare knew or should have known regarding [Whitemarsh's] pervasive misconduct." While such discovery could unearth relevant evidence, this assertion fails to articulate how the evidence would establish a genuine issue of material fact related to their

25

causes of action. Whitemarsh's supervisor might have more information about MultiCare's policies, and about Whitemarsh's relationship with Monique. If he did, it is unclear that such information would establish a genuine issue of material fact as to their negligence claims.

Even when accepting at face value the Messengers' assertion that good cause existed for the delay in obtaining the depositions of Whitemarsh's supervisor and widow, the Messengers fail to state what evidence would be established by the additional discovery. Neither do they state whether such evidence would establish a genuine issue of material fact. For the other evidence that the Messengers seek, they give no good reason for the year-long delay. Thus, we conclude the trial court did not abuse its discretion in denying their motion.

## III. CONCLUSION

We conclude that that a primary care physician who provides mental health services to a patient may be liable for malpractice for injuries arising from the doctor's sexual relationship with that patient. We also conclude that the Messengers established a genuine issue of material fact as to whether Whitemarsh provided Monique with mental health treatment, and as to whether Whitemarsh breached the applicable standard of care by engaging in a sexual relationship with Monique. We additionally conclude that the trial court properly dismissed the Messengers' negligent hiring or retention and negligent training or supervision claims against MultiCare. Finally, we conclude that the trial court did

not abuse its discretion in denying the Messengers' motion to continue the summary judgment hearing.

We affirm in part and reverse in part.

Chun, J.

WE CONCUR:

Andrus, A.C.J.

Verellen, J.