IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

| | |
|---|---|
| MOSES LAND GROW, LLC, a Washington Limited Liability Company<br><br>Respondent,<br><br>v.<br><br>BRICKSTONE HOLDINGS, LLC, a Washington Limited Liability Company; MICHAEL SCOTT FLADSETH and JANE DOE FLADSETH, husband and wife, and their marital community,<br><br>Appellant. | No. 81603-9-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

ANDRUS, A.C.J. — Michael Fladseth appeals a judgment entered against him in favor of his former joint venture partner, Moses Land Grow, LLC (MLG). He contends material issues of fact precluded summary judgment on MLG's claims of breach of contract and misrepresentation. He also argues the trial court miscalculated the judgment amount. We disagree and affirm.

## FACTS

In March 2017, Fladseth and MLG formed Brickstone Holdings, LLC (Brickstone), a joint venture engaged in the business of purchasing and developing real property located at 10843 1st Avenue South in Seattle. They signed an

operating agreement under which Fladseth agreed to act as manager of Brickstone and to make an initial capital contribution of "one half (1/2) of the $550,000 purchase price and related costs." Fladseth agreed to serve without compensation. MLG agreed to make, as its initial capital contribution, "half (1/2) of the $550,000 purchase price and related costs by wire transfer to escrow for closing and additional development costs thereafter." If either member failed to make their initial capital contribution within ten days from the effective date of the operating agreement, the defaulting member's interest would terminate.

As manager, Fladseth was given the authority to make "all decisions concerning the operation and management of the Company's business," including executing loans and encumbrances of the company and its assets. But on the same day the parties executed the operating agreement, they also executed a corporate resolution that provided that "[a]ny single expense in excess of $20,000 . . . shall be approved by a majority of the members before it is executed by the manager."

It is undisputed that MLG made its initial capital contribution of $275,000 to fund its 50 percent share of the property purchase. MLG subsequently discovered that Fladseth never made a cash capital contribution. Instead, in late April 2017, Fladseth, on behalf of Brickstone, obtained a loan of $297,840 from a lender named Eastside Funding, LLC (Eastside) and used the loan proceeds to fund his share of the purchase price. Fladseth also executed an "Unconditional Guaranty of Payment and Performance," purportedly on behalf of MLG, in which he committed MLG to repaying the Eastside promissory note. MLG's representative,

Julinda Juniarty, testified that Fladseth was never a manager, member, or agent of MLG and had no authority to execute any loan guaranty on its behalf. Fladseth did not dispute this evidence.

At the same time Fladseth signed the loan documents for the purchase of the property, he entered into a separate construction loan agreement with Eastside, under the terms of which Eastside agreed to lend Brickstone $154,500.00 to finance its development and construction expenses. He executed a "Construction Promissory Note," agreeing to pay off the balance of the note by September 16, 2017. And Fladseth executed a "Construction Deed of Trust, Security Agreement and Fixture Filing," pledging the property as collateral for the loan.

The purchase closed on or about April 21, 2017. Juniarty testified that before the sale closed, Fladseth showed her what purported to be an estimated settlement statement for the property and this statement did not reflect the fact that Brickstone had taken out any loans to fund the acquisition.

When MLG discovered that Fladseth had used loan proceeds to fund his share of the purchase price and that Fladseth had signed a guaranty in MLG's name, Juniarty demanded that Fladseth be personally responsible for the loan. On May 1, 2017, Fladseth signed a document entitled "Brickstone Holdings LLC Resolution re: Fladseth Loan Responsibility" (the May 1 Promissory Note) in which he acknowledged his personal responsibility for the loan he had taken out in Brickstone's name. The document further provided:

> M. Scott Fladseth agrees that this resolution, both in concert with the Operating Agreement and as a free standing instrument,

shall serve as a binding contract, agreement, and promissory note reflecting his responsibility for the 1st Street project loan as set forth above subject to full enforcement under the Laws of the State of Washington.

In October 2017, Fladseth took out a new loan for $280,000, doing so this time in his name personally and in the name of Brickstone, from a new lender, Kevin Downey. He executed a new promissory note and agreed to repay it with interest at a rate of 12 percent by August 19, 2018. Fladseth also executed, on behalf of Brickstone, a deed of trust, again pledging the property as collateral for the loan. Fladseth used the proceeds from this loan to pay off the Eastside construction loan of $154,500.

There is no evidence in the record that Fladseth incurred any costs to renovate any portion of the property. According to Fladseth, he immediately began looking for buyers for the warehouse. He testified that Juniarty was anxious to sell the property and wanted him to find a buyer quickly. Although Fladseth secured a few offers, each fell through.

In July 2018, MLG initiated litigation against Fladseth and Brickstone, alleging that Fladseth had not made a capital contribution as required by the operating agreement, that Fladseth had taken out loans in Brickstone's name and encumbered the property without MLG's knowledge or consent, and that Fladseth had misappropriated rental income. MLG alleged claims of breach of fiduciary duty, fraud or misrepresentation, fraudulent concealment, breach of contract, and conversion, and sought an accounting from Fladseth, an injunction removing him as manager of the company, and a dissolution of Brickstone.

- 4 -

On October 8, 2018, Fladseth executed a purchase and sale agreement with a buyer named Todd Bell for the price of $930,000, subject to financing and a 45-day feasibility study. On October 22, 2018, the court appointed a custodial receiver to take over management of Brickstone. The receiver took over negotiations relating to the ultimate sale to Bell. On December 14, 2018, the court approved the sale of the property to Bell. Although the revised purchase and sale agreement is not in the record, the excise tax affidavit shows the final purchase price was of $900,000.

As directed by the trial court, the receiver used the proceeds of the sale to pay off the debts Fladseth had caused Brickstone to incur. After paying off the company's loans, the closing costs, taxes, and sales commissions, the net proceeds of the sale were $101,154.49. As required by the order authorizing the sale, the receiver deposited those proceeds with the registry of the King County Superior Court.

MLG moved for summary judgment on two of its claims, breach of contract and misrepresentation. It sought $397,905.83 in damages from Fladseth. It also filed a motion to have the net sales proceeds on deposit with the court distributed to MLG to offset Fladseth's debt.

In November 2019, the trial court granted MLG's motions, finding Fladseth liable for breach of contract and misrepresentation. It awarded MLG $397,905.83, to be offset by the amount disbursed to MLG from the remaining sale proceeds. The court subsequently awarded MLG attorney fees of $39,694, and costs of

$2,163.32, based on a provision in the operating agreement. It entered final judgment against Fladseth after MLG voluntarily withdrew all remaining claims.

Fladseth appeals the judgment against him.

ANALYSIS

Fladseth argues the trial court erred in granting summary judgment because there are questions of fact as to whether he breached the operating agreement or misrepresented his capital contribution and whether he caused MLG to incur any damages. We disagree.

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. CR 56(c); Messenger v. Whitemarsh, 13 Wn. App. 2d 206, 210, 462 P.3d 861 (2020). "A genuine issue of material fact exists when reasonable minds could differ on the facts controlling the outcome of the litigation." Messenger, 13 Wn. App. 2d at 210 (quoting Dowler v. Clover Park Sch. Dist. No. 400, 172 Wn.2d 471, 484, 258 P.3d 676 (2011)).

If the moving party satisfies its initial burden of showing no issues of fact exist, the burden shifts to the nonmoving party to bring forth specific facts to rebut the moving party's contentions. Elcon Constr., Inc. v. E. Wash. Univ., 174 Wn.2d 157, 169, 273 P.3d 965 (2012). Although all facts and reasonable inferences must be interpreted in the light most favorable to the nonmoving party, Messenger, 13 Wn. App. 2d at 210, "[t]he nonmoving party may not rely on speculation, argumentative assertions, 'or in having its affidavits considered at face value; for after the moving party submits adequate affidavits, the nonmoving party must set

- 6 -

forth specific facts that sufficiently rebut the moving party's contentions and disclose that a genuine issue as to a material fact exists.'" Becker v. Wash. State Univ., 165 Wn. App. 235, 245-46, 266 P.3d 893 (2011) (quoting Seven Gables Corp. v. MGM/UA Entm't Co., 106 Wn.2d 1, 13, 721 P.2d 1 (1986)).

We review rulings on summary judgment de novo. Messenger, 13 Wn. App. 2d at 210.

Breach of Contract

Fladseth first argues that the trial court erred in granting summary judgment because there are issues of fact as to whether he breached the operating agreement. MLG argued below that Fladseth breached the operating agreement by failing to make a cash capital contribution within ten days of the effective date of that agreement and he violated the expenditure resolution by taking out a construction loan, well in excess of the $20,000 limit, without MLG's authorization or consent. Fladseth contends he pledged a promissory note for his half of the purchase price and this pledge constituted a permissible capital contribution under the language of the operating agreement. He also maintains that he had the authority under the operating agreement to encumber the property and the corporate expense resolution did not limit his ability to take out loans on Brickstone's behalf. We address each issue in turn.

Fladseth's Capital Contribution

The operating agreement required each member of Brickstone to make an initial capital contribution of one-half of the $550,000 purchase price within ten days of the effective date of the operating agreement.

Fladseth concedes he contributed no cash to Brickstone or to the purchase of the property. Instead, Fladseth argues he made a non-monetary capital contribution by pledging to repay the $297,840 loan he took out in Brickstone's name. There are several problems with this argument.

First, the operating agreement became effective on March 28, 2017, when Fladseth and MLG executed it. Fladseth did not execute any promissory note until May 1, 2017, more than 10 days after the operating agreement's effective date. If the May 1 Promissory Note was an acceptable non-monetary capital contribution, he did not make it until after the expiration of the 10-day period. Based on this undisputed evidence, Fladseth breached paragraph 3.3 of the operating agreement and his membership in Brickstone terminated on the day of breach.

Second, paragraph 1.7 of the operating agreement defined "Capital Contribution" as:

> [T]he amount of money, the forgiveness of any debt, and the Fair Market Value of any services or property (other than money) contributed to the Company (net of liabilities secured by such contributed property that the Company is considered to assume or take "subject to" under IRC Section 752) in consideration of a Percentage Interest held by such Member. A Capital Contribution shall not be deemed a loan.

"Fair Market Value" is also a defined term. The "Fair Market Value" of any property contributed by a member to the company "shall be the value of such property, as mutually agreed by the contributing Member and the Company."

These provisions of the operating agreement required Fladseth to contribute either money or other "property" with an agreed-upon fair market value. There is no evidence in the record that Fladseth and Brickstone reached an

agreement on the value of Fladseth's pledge to repay the Brickstone loan. Depending on Fladseth's personal wealth (or lack thereof) and assets he owned to back up this promissory note, its fair market value could have been zero.

Fladseth contends that RCW 25.15.191 permits members to pledge promissory notes as their capital contributions in limited liability companies. That statute provides:

> The contribution of a member to a limited liability company may consist of tangible or intangible property or other benefits to the limited liability company, including money, services performed, promissory notes, other agreements to contribute cash or property, or contracts for services to be performed.

But under RCW 25.15.018(1), the limited liability company agreement governs relations among members. Chapter 25.15 RCW only governs "[t]o the extent the limited liability company agreement does not otherwise provide . . ." RCW 25.15.018(2). Because the parties to this operating agreement expressly defined what the members considered to be acceptable initial capital contributions, RCW 25.15.191 does not apply. While the word "property" in paragraph 1.7 of the operating agreement could conceivably include a promissory note, because a promissory note may be a type of intangible property, In re Davis, 35 B.R. 795, 799 (Bankr. W.D. Wash. 1983) (intangible property includes stocks, bonds, promissory notes and franchises), the value of any such property remained subject to an agreement between the member and the company as to that property's fair market value. No such agreement existed here.

Finally, even if the parties had agreed that Fladseth could contribute a promissory note as his initial capital contribution, he presented no evidence that

the note had an actual value of one-half of the purchase price, as required by paragraph 3.2 of the operating agreement. Generally, when a member's capital contribution is only that member's own promissory note, the member's capital account would be $0. See 31 DALE CARLISLE & BROOKE JOHNSON, WASHINGTON PRACTICE, WASHINGTON BUSINESS LAW 804 cmt. to 25.15.191 (2019 ed.). If Fladseth's promissory note had a value of $0, he cannot claim he contributed one-half of the $550,000 purchase price.

The trial court did not err in concluding that there were no genuine issues of material fact regarding Fladseth's breach of the operating agreement based on his non-payment of one-half of the purchase price within ten days of the execution of that agreement.

Construction Loan as Encumbrance and Not Expense

Fladseth also contends he did not breach the operating agreement by taking out loans in Brickstone's name because he was authorized to execute loans and to encumber the property. We agree in part and disagree in part.

Section 5.1 of the operating agreement provided:

Except as otherwise set forth in this Agreement, all decisions concerning the operation and management of the Company's business shall be made by the Manager, and the decisions and the day to day operations of the Company shall be executed by the Manager. This includes, but is not limited to, execution of loans and encumbrances of the Company and its assets and holdings both real and chattel, entry of contracts and agreements on behalf of the Company and concerning its assets and holdings both real and chattel, and sale, disposition, acquisition, and any other action related to current, future, or past assets and holdings of the Company both real and chattel.

- 10 -

The expense resolution, executed simultaneously, provided that "[a]ny single expense in excess of $20,000 . . . shall be approved by a majority of the members before it is executed by the manager." At issue is whether this "expense" restriction applied to the $297,840 loan Fladseth executed to effectuate the acquisition of the property, the $154,500 loan Fladseth executed to cover anticipated development costs after the sale closed, or the $280,000 loan Fladseth executed to pay off the $154,500 loan.

The parties clearly contemplated that Brickstone would incur costs to acquire the land and additional costs to develop it. The operating agreement provided that "the LLC is engaged in the business of purchasing and developing the land at 10843 1st Ave South in Seattle WA 98168."

But paragraph 3.2 of the operating agreement contemplated that all of Brickstone's acquisition costs would be covered by each member's initial capital contribution. If, as Juniarty testified, MLG believed that each member would be contributing 50 percent of the cost to acquire the land, there would have been no reason to cap Fladseth's borrowing authority for the acquisition. And there is nothing in the expense resolution that suggests the contrary. We conclude the expense limitation resolution did not limit Fladseth's authority to execute a loan to acquire the land.[1]

But the expense limitation did apply to Fladseth's ability to incur expenses for developing the property. Paragraph 3.2.2 of the operating agreement contains

---

[1] We do not suggest that Fladseth acted appropriately by incurring this debt. He admitted that the $297,840 loan was for his personal benefit, and not the benefit of Brickstone, when he signed the May 1 Promissory Note and took responsibility for paying off the loan.

MLG's agreement to be responsible for covering "additional development costs" that Brickstone incurred after acquisition. It makes sense that MLG would limit Fladseth's spending authority on such development costs given MLG's commitment to cover them. We therefore conclude the expense limitation resolution did limit Fladseth's authority to spend money to develop this property or to borrow money to cover such expenses.

There is no evidence Fladseth sought MLG's consent for the construction loan or for any development expenses. When Fladseth signed the construction loan agreement with Eastside, he represented to the lender that the loan proceeds would be used to cover the cost of developing and constructing a "residential dwelling" on the property.[2] According to Eastside's records, it advanced $150,000 to Brickstone on or about May 1, 2017. Juniarty testified that "Mr. Fladseth told [MLG] that he would provide [MLG] with an accounting for the "'renovation'" costs he had undertaken for the Property. To date, he has never provided such an accounting." Fladseth did not dispute this testimony.

Indeed, there is no evidence of what Fladseth did with the funds Eastside advanced to Brickstone. Fladseth produced a WhatsApp chat log of messages he and Juniarty exchanged between October 26, 2017 and July 26, 2019 to demonstrate that he kept her updated on his progress in trying to sell the property. But not a single message relates to expenses Fladseth wanted or needed to incur to develop the property before he could market or sell it. These messages all relate to prospective purchasers, anticipated sale dates and renting the warehouse

---

[2] We assume the reference to a residential dwelling was an error given that Fladseth testified the property Brickstone acquired was a small commercial warehouse.

space to tenants pending sale.  There is no evidence Fladseth sought or obtained MLG's approval, orally or in writing, for any development costs associated with this property, despite incurring liability to Eastside for $150,000 in development costs. The trial court did not err in concluding that, based on this record, there are no disputed facts that Fladseth violated the spending limit resolution by borrowing $150,000 for development costs he never incurred.

Fladseth appears to suggest that he improved the property in some way just based on the difference between the May 2017 purchase price of $550,000 and the December 2018 sales price of $900,000.  But if Fladseth had invested money to improve the property, he would have been in the best position to identify these improvements.  He provided no such evidence.  And facts required to defeat a motion for summary judgement must be based on more than mere possibility or speculation.  Doe v. Dep't of Transp., 85 Wn. App. 143, 147, 931 P.2d 196 (1997). There is nothing in the record to suggest that Fladseth invested any funds in the property in order to enhance its value.

The uncontested evidence demonstrates that Fladseth breached the operating agreement by not making the requisite capital contribution within ten days of the execution of the operating agreement and by exceeding the expense spending limit by borrowing $154,500 for development costs and then not using the proceeds for these expenses.  Summary judgment on the contract claim was appropriate.

Negligent Misrepresentation

Fladseth next argues the trial court erred when it found him liable for misrepresentation because (1) he did not misrepresent his capital contribution to MLG; (2) MLG did not rely on any such misrepresentation; and (3) MLG was not damaged by any misrepresentation.

To establish negligent misrepresentation, MLG must show:

> (1) the defendant supplied information for the guidance of others in their business transactions that was false, (2) the defendant knew or should have known that the information was supplied to guide the plaintiff in [their] business transactions, (3) the defendant was negligent in obtaining or communicating the false information, (4) the plaintiff relied on the false information, (5) the plaintiff's reliance was reasonable, and (6) the false information proximately caused the plaintiff damages.

Merriman v. Am. Guar. & Liab. Ins. Co., 198 Wn. App. 594, 613, 396 P.3d 351 (2017) (quoting Ross v. Kirner, 162 Wn.2d 493, 499, 172 P.3d 701 (2007).

MLG contended that Fladseth committed misrepresentation by failing to disclose that he had not contributed cash as his initial capital contribution and had instead taken out a loan in Brickstone's name to purchase the property. Juniarty testified she did not know, before closing on the property, that Fladseth had failed to make a cash capital contribution. Fladseth did not dispute this testimony. Juniarty also testified that, prior to closing the purchase, Fladseth showed her an estimated settlement statement that did not include the loan he had taken out to finance the acquisition. Fladseth did not dispute this evidence. Juniarty testified Fladseth took out these loans without MLG's knowledge and consent. Again, Fladseth did not dispute this evidence.

Ordinarily, an omission, by itself, cannot constitute negligent misrepresentation. Ross, 162 Wn.2d at 499. But a party may be liable for negligent misrepresentation for an omission if he has a duty to disclose, which can arise in a business transaction if imposed by a fiduciary relationship or other similar relationship of trust or confidence. Van Dinter v. Orr, 157 Wn.2d 329, 333-34, 138 P.3d 608 (2006). Under Washington's Limited Liability Company Act, in a manager-managed LLC, the manager owes a fiduciary duty to the LLC and its members. Dragt v. Dragt/DeTray, LLC, 139 Wn. App. 560, 575, 161 P.3d 473 (2007); Dickens v. Alliance Analytical Laboratories, LLC, 127 Wn. App. 433, 440, 111 P.3d 889 (2005).

Fladseth, as Brickstone's manager, owed a fiduciary duty to both Brickstone and MLG not to supply false information to them. Here, Fladseth did not disclose the existence of the Eastside loans, one of which Fladseth had obtained by signing a forged guarantee on behalf of MLG. This evidence was sufficient to prove negligent misrepresentation.

The undisputed evidence also proves that MLG reasonably relied on Fladseth's misrepresentation. Juniarty testified that, had she known that Fladseth had not made his capital contribution, MLG would have either rescinded its own capital contribution or withdrawn from the purchase of the property.

Fladseth argues that MLG could not have relied on this misrepresentation because it knew of the loans. To support this, Fladseth points to the May 1 Promissory Note and to the WhatsApp messages. But neither proves that Juniarty knew about the loans before the purchase closed on April 21. The May 1

Promissory Note came a week after closing. The WhatsApp messages occurred months after closing as well. The fact that Juniarty knew of the loans in May 2017 does not contradict her testimony that MLG reasonably relied on Fladseth's misrepresentations in April 2017 when it made its capital contribution and allowed the sale to close.

Finally, the undisputed evidence establishes that MLG was damaged by Fladseth's misrepresentations. But for the misrepresentation, MLG would have retained the $275,000 it contributed to Brickstone. The trial court properly found Fladseth liable for misrepresentation.

Damages

Finally, Fladseth contends there are genuine issues of material fact regarding MLG's claimed damages.

"Generally, the measure of damages for breach of contract is that the injured party is entitled to recovery of all damages naturally accruing from the breach, and to be put in as good a position as he would have been in had the contract been performed." Nw. Land & Inv., Inc. v. New W. Fed. Sav. & Loan Ass'n, 57 Wn. App. 32, 43, 786 P.2d 324 (1990). Damages recoverable for negligent misrepresentation are limited to those necessary to compensate the plaintiff for the pecuniary loss to him caused by the misrepresentation. Janda v. Brier Realty, 97 Wn. App. 45, 50, 984 P.2d 412 (1999) (quoting RESTATEMENT (SECOND) OF TORTS § 552B (AM. LAW INST. 1977)). This includes "pecuniary loss suffered otherwise as a consequence of the plaintiff's reliance upon the misrepresentation." Id.

- 16 -

The trial court awarded MLG $397,905 in damages. The court calculated this amount by taking the total sale price of $900,000, subtracting $104,188.33 in closing costs, unpaid real estate taxes, and sale commissions, for net sales proceeds of $795,811.67. Had Fladseth not encumbered the property with personal loans, or with construction loans, the proceeds of which appear to have vanished, this sum would have been Brickstone's profit. Under the operating agreement, MLG was entitled to 50 percent of that amount, or $397,905.83. The trial court correctly concluded that this amount is what MLG would have received from the sale of the property but for Fladseth's misrepresentation and breach of the operating agreement.

Fladseth argues that these damages were miscalculated because there are genuine issues of fact whether MLG's actions contributed to its damages. Fladseth contends MLG intervened in the management of the property, causing Brickstone to default on its loan obligations. He argues that the costs associated with these loan defaults should be attributable to MLG. But Fladseth agreed to be personally liable for the Eastside loan of $297,840. Any default on this loan was not MLG's legal responsibility; it was his. We do not have any of the receivership pleadings in the record before us, as Fladseth has not challenged the order appointing a receiver. But the receivership statute allows the appointment of a receiver in very limited circumstances, including when a company is insolvent and unable to meet its debts. There is no evidence in this record to suggest MLG was responsible for the Brickstone's financial condition warranting the appointment of a receiver.

Fladseth next contends MLG's counsel began collecting rents from the tenants of the property starting in July 2018, leading to what he identified as "penalty interest on various loans." But we have no further details other than this vague, uncorroborated statement. It is insufficient to create a genuine issue of material fact.

Finally, Fladseth asserts that MLG is somehow responsible for the property being sold for $900,000 rather than the $930,000 price he negotiated before the appointment of the receiver. Again, this accusation is not substantiated by any evidence. The sale agreement Fladseth negotiated before the receiver took over was subject to both a financing contingency and a feasibility contingency. We can only speculate as to what negotiations occurred to lift either of these contingencies. And the trial court's calculation of MLG's damages accounted for this decreased return by basing MLG's award on the lower sale price.

Fladseth failed to present evidence to create a genuine issue of material fact as to the amount of MLG's damages. Summary judgment for MLG was thus appropriate.

B. Attorney Fees on Appeal

Both Fladseth and MLG request attorney fees on appeal.

A party may request an award of attorney fees and costs if the applicable law provides the right to recover fees and costs on appeal. RAP 18.1(a). Here, the operating agreement provides that if either member fails to make their required capital contributions within ten days of the agreement's effective date, that member shall indemnify the other member from any "loss, cost, or expense, including

reasonable attorney fees incurred, caused by the failure to make such Capital Contribution."

MLG prevailed on its claim that Fladseth failed to make his capital contribution and was awarded attorney fees below.  Because MLG is the prevailing party on appeal, we award it reasonable attorney fees incurred on appeal, subject to compliance with RAP 18.1.

We affirm.

_Andrus, A.C.J._

WE CONCUR:

_Brumm, J_          _Appelwick, J._