IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| CEMENT DISTRIBUTORS, INC., a Washington corporation, | No. 87723-2-I |
| Respondent/Cross Appellant, | DIVISION ONE |
| v. | UNPUBLISHED OPINION |
| GORDON E. NIES, individually, and the marital community comprised of GORDON E. and KAY L. NIES, husband and wife, | |
| Appellants/Cross Respondents, | |

HAZELRIGG, C.J. — Gordon Nies appeals and Cement Distributors Inc. (CDI) cross appeals from the judgment entered by the trial court following a bench trial where it found Nies breached his fiduciary duty as chief financial officer of CDI by filing false tax forms with and failing to transfer funds withheld from employee paychecks to both the Internal Revenue Service and the Canada Revenue Agency. The parties each contend that the trial court committed various errors related to its interpretation of an agreement transferring Nies' shares back to CDI. Because the trial court so erred, we reverse and remand for further proceedings consistent with this opinion.

FACTS

Gordon Nies was the chief financial officer (CFO) of Cement Distributors Inc. (CDI) from 1994 until his resignation in 2015.[1] Nies held "an approximate 5 percent interest of shares in CDI." The other shares were held by members of the Walden family and one other CDI employee who, like Nies, was not a member of the Walden family, and were governed by the "Shareholders' Agreement."

Nies, in his capacity as CFO, "submitted false Form 940 and 941 tax returns on behalf of CDI for the years 2006, 2008, 2011, and 2012, thereby making CDI liable to pay back taxes, interest, and penalties. He did not inform the other members of CDI that he was doing this." Nies withheld money from employee paychecks for Medicare and Social Security contributions, but the "withheld pay was never delivered to the Internal Revenue Service (IRS) to satisfy any CDI tax obligations. Mr. Nies also failed to pay tax debts to the Canadian Revenue Agency (CRA) during the same period" and, critically, failed to inform others at CDI as to this failure.

Bruce Walden, chief executive officer (CEO) of CDI, became aware of these facts when the IRS sent him a notice of outstanding tax debt on July 24, 2015. Nies submitted a letter of resignation to Walden on July 30 which simply stated,

> Because of the hardship I've caused you and CDI, it's not in the best interest of you or me to continue my employment.
> I am sorry I violated your trust in me after all these years together, you've always supported me in everything and I failed you. I have no credible reason or excuses for my actions, you deserved much better from me.

---

[1] The following facts are drawn from the unchallenged findings of fact entered by the trial court following the bench trial, unless otherwise noted.

Over a year later, in September 2016, Nies met with Walden "to discuss the termination of Mr. Nies' interest in CDI as a shareholder." At trial, Nies and Walden offered differing testimony about what was discussed as to Nies' ongoing liability to CDI for issues relating to the unpaid taxes. Walden asserted that "he never discussed releasing Mr. Nies from liability, but Mr. Nies testified that, at that meeting, they specifically discussed that Nies would 'be relieved of any future liabilities' in exchange for returning his shares to CDI."[2] The court, however, noted, "Walden testified that he told Nies he didn't deserve the shares, that Walden never told Nies that Walden would release Nies from liability or any claim for damages, and that Nies never said anything about a release."

Shortly after his meeting with Walden, Nies met with counsel for CDI, Larry Trivett, on September 21 to discuss the transfer of his shares back to CDI. Trivett would later testify that they "did not discuss a release of possible claims against Mr. Nies or Mr. Nies' liability resulting from CDI's IRS [and] CRA problems." At that meeting, Nies signed a document titled "Transfer of Shares to Corporation" (share transfer agreement or STA) before a notary public. While the share transfer agreement was prepared by Trivett, it was "not signed by anyone representing CDI." The STA is comprised of a single sentence that reads as follows:

> In Consideration of the cancellation of all obligations which I may have, pursuant to the terms of that Shareholders' Agreement, dated August 31, 1996, I, GORDON NIES, hereby irrevocably convey, transfer, release, and assign to CEMENT DISTRIBUTORS, INC. ("CDI"), all of my shares of CDI stock, either attached hereto, or which I may otherwise own.

---

[2] Nies did not prepare or provide the report of proceedings from the trial as part of the record on appeal. As such, the content and characterization of testimony in this opinion relies solely on the trial court's capture and characterization of testimony in its unchallenged findings of fact and conclusions of law.

(Emphasis omitted.)

In December 2017, CDI filed a complaint that alleged several claims against Nies individually and his marital community,[3] including breach of fiduciary duty, fraud, indemnification and contribution, and unfair business practices, as well as a request for forensic accounting. As relief, CDI requested a sum estimated "to be in excess of US $1,079,646.95, and [Canadian] $299,049.72, plus additional interest." Nies served his answer and affirmative defenses on opposing counsel in April 2018 but later asserted without explanation that the pleading was not filed with the court until September 2022. In November 2023, he sought leave to file a first amended answer and affirmative defenses. The judge entered an agreed order granting that request on December 8, and Nies' amended answers and affirmative defenses were filed a few days later. Nies' answers consisted mainly of denials, although he did assert an affirmative defense for offset: "If not a settlement of debts, [Nies] is still entitled to a setoff of the value of the Shares transferred to [CDI] through the September 21, 2016, Transfer of Shares to Corporation in an amount to be determined at trial."

Nies filed a motion for summary judgment and supporting declaration in March 2024 after substituting his trial counsel. Nies' motion argued that CDI's complaint should be dismissed because the transfer of his shares back to CDI released him from all claims under the terms of the Shareholders' Agreement and

---

[3] While CDI brought suit and the judgment after trial was ultimately entered against Nies, individually and as his marital community, we collectively refer to Nies, his spouse, and marital community as "Nies" for clarity.

the STA and, thus, he had been discharged from liability for the tax debt and penalties that CDI had incurred as a result of his conduct.

CDI opposed summary judgment and asserted that Nies had only been released from obligations set forth in the Shareholders' Agreement and, even then, only a limited subset of his obligations under that agreement. CDI specifically contended that Nies was freed from his obligation "to specify the price at which he would offer his shares in CDI first to the Corporation, and then if it was not willing, then to the 'Offeree Shareholders.'" CDI averred that when it accepted the return of Nies' shares, "Nies was released from that obligation, and no other." CDI's motion was substantively supported by a declaration from Walden in his capacity as CEO, Walden's daughter Lynn Wise, and another shareholder who had worked under Nies at CDI.

On April 5, the trial court entered an order that denied Nies' motion for summary judgment. The court also denied CDI's motion to strike as hearsay a letter Nies had attached as an exhibit to his motion. On April 15, Nies sought reconsideration of the trial court's order and asserted that the trial court had "made a clear legal error. The legal analysis for denying summary judgment was flawed because it sought to allow extrinsic evidence to interpret the subject Release,"[4] the application of which, he averred, should have resulted in the dismissal of CDI's claim. CDI opposed reconsideration and contended that "the [c]ourt did not improperly consider extrinsic evidence in its ruling" and, further, Nies "failed even to identify what 'extrinsic evidence' the [c]ourt supposedly considered improperly."

---

[4] Consistent with his argument as to its interpretation, Nies referred to the STA as a "release" or "waiver" in pleadings before the trial court and on appeal.

CDI also reiterated its interpretation of the STA. The trial court denied reconsideration on April 25, 2024.

A bench trial was conducted on May 20, which consisted of testimony from Wise, Trivett, Nies, Jonathan Walden, and Lewis Walden.[5] The trial court entered its finding of facts and conclusions of law several months later in August. Essential to the present appeal, it found that Nies breached the duty of good faith he owed to CDI, the share transfer agreement excused Nies from liability in consideration for CDI foregoing its claims against him and the return of the shares, the STA was void as against public policy, and Nies was entitled to an offset for the value of shares that he had transferred to CDI. The trial court also ordered that "CDI shall submit a judgment against Mr. Nies in the principle [sic] amount of $233,957.59," which was the amount attributable to Nies' breach after an offset for the value of the transferred shares had been subtracted. The trial court found that CDI had failed to prove on a more probable than not basis that Nies had appropriated CDI's funds for his own benefit.

On August 26, Nies sought reconsideration of "the [c]ourt's conclusion of law that the waiver agreement between himself and Cement Distributors, Inc. ("CDI") was rendered unenforceable on public policy grounds." He argued that the court erred because

> public policy also strongly favors settlements, and the evidence presented at the trial demonstrate[d] that, at the time CDI and Nies entered into the waiver agreement more than a year after Nies resigned, CDI had full knowledge of any and all information Nies could have disclosed, as well as the legal consequences.

---

[5] Because a report of proceedings from the bench trial was not provided in this appeal, this list is compiled from the trial minutes included in the clerk's papers.

CDI opposed reconsideration on the grounds that there was "no basis to conclude that . . . Nies [had] fulfilled the demanding standard of CR 59(a)(7), which require[d] Nies to establish that 'there [wa]s no evidence or reasonable inference from the evidence to justify the verdict or the decisions, or that it [wa]s contrary to law.'"

The trial court denied Nies' motion for reconsideration and entered additional findings. These included that Nies had "admitted wrong-doing and apologized in his letter of resignation to Mr. Walden" but also that he never disclosed the amount owed or the debt to the CRA, along with a series of findings that were essentially a timeline of corroborating events regarding Nies' incomplete disclosures about his handling of the United States and Canadian tax issues to any officer of CDI.

Nies timely appealed, and CDI timely cross appealed.

ANALYSIS

I.    Denial of Summary Judgment Not Reviewable After Trial

Nies first avers that the trial court erred when it denied his motion for summary judgment because it considered "extrinsic evidence" when it construed the share transfer agreement and found genuine issues of material fact that precluded summary judgment. CDI asserts that we should decline review of the challenged order due to the "general rule" that "an order on a motion for summary judgment is no longer reviewable once a case has gone to trial" and because Nies failed to provide us with the necessary report of proceedings for review. In reply, Nies contends that we can review the summary judgment order because it solely concerned questions of law.

Summary judgment is governed by CR 56. The trial court will grant a motion for summary judgment if the moving party establishes "that there is no genuine issue as to any material fact" and it is "entitled to judgment as a matter of law." CR 56(c). We review the trial court's summary judgment order de novo. *Greensun Grp., LLC v. City of Bellevue*, 7 Wn. App. 2d 754, 767, 436 P.3d 397 (2019). There is a genuine issue of material fact if "'reasonable minds could differ on the facts controlling the outcome of the litigation.'" *Messenger v. Whitemarsh*, 13 Wn. App. 2d 206, 210, 462 P.3d 861 (2020) (quoting *Dowler v. Clover Park Sch. Dist. No. 400*, 172 Wn.2d 471, 484, 258 P.3d 676 (2011)). Washington courts have "held that 'an order denying summary judgment, based on the presence of material, disputed facts will not be reviewed when raised after a trial on the merits.'" *Leitner v. City of Tacoma*, 15 Wn. App. 2d 1, 18-19, 476 P.3d 618 (2020) (quoting *Johnson v. Rothstein*, 52 Wn. App. 303, 306, 759 P.2d 471 (1988)). There is an exception for decisions that "turned solely on a substantive issue of law." *Id.* at 19.

Here, our review of the summary judgment order is precluded. The issue at the heart of the summary judgment motion was the resolution of the competing interpretations of the share transfer agreement presented by the parties, specifically whether it operated as a release of any and all liability for Nies' conduct, and the court considered several declarations in reaching its ruling. The mere fact the motion for summary judgment was denied, viewed within the context of the plain language of CR 56 regarding a genuine issue of material fact, supports our conclusion that the trial court's ruling that denied the motion was based on a determination that resolution of those material facts was required. *See Kaplan v.*

*Nw. Mut. Life Ins. Co.*, 115 Wn. App. 791, 799, 65 P.3d 16 (2003) ("A summary judgment denial cannot be appealed following a trial if the denial was based upon a determination that material facts are disputed and must be resolved by the factfinder." (quoting *Brothers v. Pub. Sch. Emps. of Wash.*, 88 Wn. App. 398, 409, 945 P.2d 208 (1997))). Nies' framing of this assignment of error in his opening brief suggests he agrees with this assessment as he argues, "The trial court . . . denied summary judgment . . . in part relying upon extrinsic evidence in the form of the [t]estimony of Lynn Wise and Bruce Walden to find that material issues of fact precluded summary judgment." However, such concession is fatal to this assignment of error as a denial of a motion for summary judgment based on the existence of competing facts, not one that "turned solely on a substantive issue of law," is plainly not reviewable after trial. *See Leitner*, 15 Wn. App. 2d at 19. Perhaps more critically, Nies fails to cogently explain what relief we could possibly grant on this assignment of error given that the result of this ruling was that he had a trial on the issue and was able to fully develop his argument there. Accordingly, we decline to reach the merits of this issue.

II.     Challenges to Findings of Fact and Conclusions of Law

Nies next assigns error to a number of findings of fact and conclusions of law entered by the court after the bench trial. Specifically, he challenges I-14, A-3 through A-5, A-7, A-10, E-6 through E-8, and E-10 through E-12.[6] CDI assigns

---

[6] Notably, while the document is captioned "Findings of Fact & Conclusions of Law After Bench Trial," the judge did not specifically identify which were its findings of fact and which were its conclusions of law. However, while such clarity facilitates appellate review, it is ultimately of little import as we consider findings and conclusions based on their substance and not their label. *See In re Est. of Haviland*, 162 Wn. App. 548, 561, 255 P.3d 854 (2011).

error to E-2 through E-5. However, as with his assignment of error regarding the denial of summary judgment, Nies both fails to engage with the proper standard of review for such a challenge and to provide a sufficient record on appeal.

We review "a trial court's decision following a bench trial by asking whether substantial evidence supports the findings and whether the findings support the court's conclusions of law. *Casterline v. Roberts*, 168 Wn. App. 376, 381, 284 P.3d 743 (2012). "'Substantial evidence to support a finding of fact exists where there is sufficient evidence in the record to persuade a rational, fair-minded person of the truth of the finding.'" *Herdson v. Fortin*, 26 Wn. App. 2d 628, 636, 530 P.3d 220 (2023) (internal quotation marks omitted) (quoting *Hegwine v. Longview Fibre Co.*, 162 Wn.2d 340, 353, 172 P.3d 688 (2007)). "If the standard is satisfied, a reviewing court will not substitute its judgment for that of the trial court even though it might have resolved a factual dispute differently." *Sunnyside Valley Irr. Dist. v. Dickie*, 149 Wn.2d 873, 879-80, 73 P.3d 369 (2003). In a practical sense, that means that we do not consider whether the evidence could support an alternate finding, only whether the finding made by the trial court is properly supported. In so doing, "[w]e 'view the evidence in the light most favorable to the prevailing party' and do not 'reassess the credibility of trial court witnesses.'" *Herdson*, 26 Wn. App. 2d at 636 (quoting *Garza v. Perry*, 25 Wn. App. 2d 433, 453, 523 P.3d 822 (2023)). "Unchallenged findings are verities on appeal. *Jensen v. Lake Jane Ests.*, 165 Wn. App. 100, 105, 267 P.3d 435 (2011).

Before applying the foregoing law regarding substantial evidence review of findings of fact, we must parse out which of the determinations by the trial court

Nies challenges are findings of fact (FF) and which are conclusions of law (CL). I-14 is a finding of fact wherein the trial court weighed the credibility of the various witnesses who testified at the trial. A-3 and A-5 are CLs, which are subject to de novo review, A-7 and A-10 are FFs which we review for substantial evidence, and A-4 is mixed. E-6, E-7, and E10 are conclusions of law, E-8 and E-11 are findings of fact, and E-12 is ordering language that directs CDI to act.

### A. Abandoned Challenges

While Nies acknowledges in his opening brief that we apply the substantial evidence test to assignments of error that challenge findings of fact, he does not define, much less apply, that test to the relevant portion of mixed FF/CL A-4 or FFs A-7, A-10, E-8, or E-11. Further, as many of the challenged findings are based on trial testimony and Nies failed to provide a report of proceedings, we could not conduct the proper appellate review even if he had so engaged in his briefing. This is so because "[a]n 'insufficient record on appeal precludes review of the alleged errors.'" *View Ridge Ests. Homeowners Ass'n v. Guetter*, 30 Wn. App. 2d 612, 637, 546 P.3d 463 (quoting *Bulzomi v. Dep't of Lab. & Indus.*, 72 Wn. App. 522, 525, 864 P.2d 996 (1994)), *review denied,* 3 Wn.3d 1016 (2024). It is the duty of the appellant to designate a sufficient record for review. *See id.* Separately, even if we had the report of proceedings, we would not consider his challenge to finding I-14 as it is the trial court's credibility determination regarding the witnesses who testified at trial, which is expressly exempted from substantial evidence review. *See Herdson*, 26 Wn. App. 2d at 636. Because Nies has not provided the requisite record from the trial court or applied the relevant test to that record, his challenges

to findings A-4, A-7, A-10, E-8, and E-11 are abandoned, as are his assignments of error to conclusions A-3, A-5, E-6, E-7, and E-10.

### B. Interpretation of Share Transfer Agreement

One of the challenges we can review, despite the absence of the report of proceedings from trial, goes to the trial court's conclusion of law[7] as to the interpretation of the STA. Generally speaking, "[c]ontract interpretation is a question of law that we review de novo." *Kiona Park Ests. v. Dehls*, 18 Wn. App. 2d 328, 335, 491 P.3d 247 (2021). The trial court's interpretation of the STA is found in E-2 though E-5 in the findings and conclusions entered after the bench trial, to which CDI assigned error in its cross appeal. CDI specifically contends that the trial court erred when it adopted Nies' proffered interpretation: "[T]he [t]rial [c]ourt got lost in the weeds—by focusing solely on the placement of commas— and lost sight of the document as a whole." Nies avers that "the trial court properly interpreted the parties' agreement as drafted by CDI's counsel, and CDI's arguments are insufficient to establish reversible error on appeal." Nies is incorrect.

We interpret a settlement agreement as we would a contract. *Marshall v. Thurston County*, 165 Wn. App. 346, 351, 267 P.3d 491 (2011). Again, contract interpretation is a question of law subject to de novo review. *Kiona Park Ests.*, 18

---

[7] At oral argument before this court, counsel for Nies expressly conceded that this question involves a conclusion of law. Wash. Ct. of Appeals oral arg., *Nies v. Cement Distribs., Inc.*, No. 87723-2-I (Jan. 15, 2026), at 2 min., 43 sec., *video recording by* TVW, Washington State's Public Affairs Network, https://tvw.org/video/division-1-court-of-appeals-2026011406.

While CDI did not expressly frame its argument on this issue as a challenge to a conclusion of law, likely because of the absence of such designations within the findings and conclusions prepared by the trial court, the analysis and authority presented in briefing were consistent with de novo review of a question of law.

Wn. App. 2d at 335. Washington follows the objective manifestation approach to contract interpretation wherein we discern the parties' intent "by focusing on the objective manifestations of the agreement, rather than the unexpressed subjective intent of the parties." *Hearst Commc'ns, Inc. v. Seattle Times Co.*, 154 Wn.2d 493, 503, 115 P.3d 262 (2005). As the reviewing court, we "impute an intention corresponding to the reasonable meaning of the terms used." *Id.* We may consider extrinsic evidence "to determine the meaning of specific words used, but not to show an intention independent of the instrument or to vary, contradict or modify the words of the contract." *Marshall*, 165 Wn. App. at 351. We construe "written contracts against their drafters such that they cannot later benefit from 'mistakes' that they were in a position to prevent." *McKasson v. Johnson*, 178 Wn. App. 422, 429, 315 P.3d 1138 (2013).

CDI challenges the following portion of the "Waiver of Liability" section of the findings and conclusions:

> 2. "A clause is said to be restrictive (or defining) if it provides information that is essential to understanding the intended meaning of the rest of the sentence. Restrictive clauses . . . are never set off by commas from the rest of the sentence." Chicago Manual of Style § 6.27 (17th ed. 2017); *See also* Texas Law Review Manual on Usage & Style § 1.21 (15th ed. 2020). On the other hand, "[a] clause is said to be nonrestrictive (or nondefining or parenthetical) if it could be omitted without obscuring the identity of the noun to which it refers or otherwise changing the intended meaning of the rest of the sentence. Nonrestrictive relative clauses . . . are set off from the rest of the sentence by commas." *Id.* When a comma gives a contract a clear and certain meaning, a court cannot, in the absence of fraud or mutual mistake, make a new contract by eliminating the comma. *Peters v. Watson Co.,* 40 Wn.2d 121, 123 (1952).
>
> 3. Within the "Transfer of Shares to Corporation" document, the comma before and after the phrase "pursuant to the terms of that Shareholders' Agreement, dated August 31, 1996," operates to set

off a nonrestrictive clause, meaning that *it can be omitted without changing the intended meaning of the rest of the sentence*. That is, "[i]n Consideration of the cancellation of all obligations which I may have, [ ] I, GORDON E. NIES, hereby irrevocably convey, transfer, release, and assign . . . all of my shares . . ." Ultimately, this is the reading proposed by Mr. Nies. Without the commas, the clause beginning "pursuant to the terms . . . " would be a restrictive clause that changes the meaning of "all obligations" to those that flow from the Shareholder's Agreement, which is the reading proposed by CDI.

4. As written, the commas as used in the "Transfer of Shares to Corporation" have a clear and certain effect on the contract: all obligations Mr. Nies has to CDI were cancelled in consideration of Mr. Nies transferring his shares to CDI. *This court cannot give the contract a new meaning by removing any commas from the document, especially when the party proposing to do so was the drafter*.

5. CDI argues that reading the contract in this way renders the clause within the comas [sic] meaningless. *However, the clause could be read to explain the sentence that follows.*

(Emphasis added) (alterations in original).

The statement in E-2 is neither a true conclusion of law nor a finding of fact, but rather a collection of various statements from style guides regarding restrictive and nonrestrictive clauses and commas, none of which are applied to the relevant documents in the case at bar. E-4 and E-5 are findings of fact; E-4 captures the trial court's application of the style rules set out in E-2 to the STA, and E-5 merely sets out, and then refutes, CDI's argument on the point addressed in E-4. Only E-3 contains a conclusion of law, that is, the trial court's legal interpretation of the STA.

### 1. Internal Inconsistency in Findings and Conclusions

As a preliminary matter, the trial court heard testimony from the parties regarding their disputed intentions for the STA, but its analysis relied solely on the

text of the agreement itself, particularly its technical composition. The judge's interpretation hinged on the operation of a comma based on grammatical rules and explicitly relied on *Peters v. Watson Co.,* 40 Wn.2d 121, 123, 241 P.2d 441 (1952), for the rule that when "a comma gives a contract a clear and certain meaning, a court cannot in the absence of fraud or mutual mistake, make a new contract by eliminating the comma." While interpretation of a writing "'will typically heed the commands of its punctuation,'" reliance "'only on punctuation is necessarily incomplete'" and risks distortion of the true meaning of a contract. *Dep't of Lab. & Indus. v. Slaugh,* 177 Wn. App. 439, 449, 312 P.3d 676 (2013) (quoting *U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 454 (1993)). Further, the trial court's findings and conclusions regarding the STA are variously internally inconsistent and/or unsupported by the documentary record. I-10 through I-14 and I-16 in the findings and conclusions highlight this dissonance:

10. On September 16, 2016, over a year after his resignation, Mr. Nies met with Mr. Walden at the Lynnwood Denny's to discuss the termination of Mr. Nies' interest in CDI as a shareholder. *Mr. Walden testified that he never discussed releasing Mr. Nies from liability*, but Mr. Nies testified that, at that meeting, they specifically discussed that Nies would "be relieved of any future liabilities" in exchange for returning his shares to CDI.

11. *Bruce Walden testified that he told Nies that Nies didn't deserve the shares, that Walden never told Nies that Walden would release Nies from liability or any claim for damages, and that Nies never said anything about a release.*

12. On September 21, 2016, Mr. Nies met with Larry Trivett, CDI's counsel, to arrange for the transfer of his shares back to CDI. During that meeting, Mr. Nies signed a document titled "Transfer of Shares to Corporation," which is included within the record as Exhibit 31. *Mr. Trivett testified that he and Mr. Nies did not discuss a release of possible claims against Mr. Nies or Mr. Nies' liability resulting from CDI's IRS & CRA problems that Mr. Nies caused.*

13. *The "[T]ransfer of [S]hares to [C]orporation" was not signed by anyone representing CDI.* However, after Mr. Nies signed this document, CDI took control of Mr. Nies' thirteen shares in the corporation.

14. The [c]ourt has considered this testimony in light of the credibility issues of Mr. Nies, given the historic hiding of information from CDI, lying to the IRS, and general failure to disclose information. Because of this, *the [c]ourt finds the testimony of Mr. Walden and Mr. Trivett more credible and finds that there was not a discussion of waiving claims or the liability of Mr. Nies for his actions with the IRS and CRA.*

. . . .

16. CDI states that the Transfer of Shares to Corporation document cancels Mr. Nies's obligations pursuant to the Shareholder's Agreement but is not a hold harmless agreement. To this end, *Mr. Trivett, the drafter of the document, testified that the comma setting off the clause "pursuant to the terms of the [S]hareholder's Agreement" limits that clause to "all obligations which I may have."*

(Emphasis added.) Critically here, the court carefully set out the conflicting testimony and expressly rendered a credibility finding in I-14; the court determined that Walden and Trivett's testimony was credible and Nies' was not. Further, the court specifically found that "there was not a discussion of waiving claims or the liability of Mr. Nies for his actions with the IRS and CRA."

The court also found in I-13 that the STA "was not signed by anyone representing CDI" and yet nonetheless concluded that the document operated as a total release of liability.[8] As Nies pointed out in his briefing, "release" is defined in the *Restatement (Second) of Contracts* § 284(1) (Am. Law. Inst. 1981) as "a

---

[8] To be clear, the STA includes the term "obligations" and while the trial court used that word in its interpretation of the STA contained in E-4 that CL is set out in section E of the trial court's findings and conclusions titled, "Waiver of Liability."

writing providing that *a duty owed to the maker of the release* is discharged immediately or on the occurrence of a condition," and comment (a) to that rule explains, "Although no particular form is required for an agreement to discharge a duty, the term 'release' has traditionally been reserved for a *formal written statement by an obligee that the obligor's duty is discharged*." (Emphasis added.) Nowhere in its findings and conclusions did the trial court address any law regarding evidence of acceptance of a complete release or waiver of liability by the obligee. Here, the trial court determined that Nies was the party who owed a duty "to the maker of the release," CDI, under the Shareholder's Agreement and as a fiduciary. Thus, under the *Restatement*, Nies was the obligor and CDI the obligee. But the *Restatement* is not the only source for the contention that for a release or waiver to be enforceable, there must be evidence of acceptance by the obligee. This is because such a release or waiver "is a contract in which one party agrees to abandon or relinquish a claim, obligation or cause of action against another party" and "[a]s a contract, a release is to be construed according to the legal principles applicable to contracts." *Boyce v. West*, 71 Wn. App. 657, 662, 862 P.2d 592 (1993). Exculpatory clauses, as agreements regarding release of liability, "are strictly construed and must be clear if the exemption from liability is to be enforced." *Scott v. Pac. W. Mountain Resort*, 119 Wn.2d 484, 490, 834 P.2d 6 (1992). Critically, our state's highest court has held that "a release must be expressly stated and not implied." *Condon v. Condon*, 177 Wn.2d 150, 165, 289 P.3d 86 (2013). The clearest "objective manifestation of [the] intent to be bound" is a

signature. *Retail Clerks Health & Welfare Tr. Funds v. Shopland Supermarket, Inc.*, 96 Wn.2d 939, 944, 640 P.2d 1051 (1982).

2.      Misapplication of Principles of Contract Interpretation

Separately, the trial court's interpretation of the STA is erroneous on the basis that it failed to apply strict contract interpretation principles. Again, we look to the parties' "objective manifestations of the agreement, rather than the unexpressed subjective intent of the parties," and apply "an intention corresponding to the reasonable meaning of the terms used." *Hearst Commc'ns*, 154 Wn.2d at 503. Further, "'[a]n interpretation of a contract that *gives effect to all provisions* is favored over an interpretation that renders a provision ineffective.'" *Kiona Park Ests.*, 18 Wn. App. 2d at 335 (emphasis added) (quoting *Snohomish County Pub. Transp. Benefit Area Corp. v. FirstGroup Am., Inc.*, 173 Wn.2d 829, 840, 271 P.3d 850 (2012)).

The trial judge erred because she appears to have accepted Nies' argument and incorrectly conflated two distinct terms, one of which was expressly used in the share transfer agreement, "obligations," and one that was not, "liabilities." Further, the trial court's interpretation of the STA renders a provision ineffective. Nies had argued in the trial court that "'all obligations' can only have one interpretation—that is, each and every obligation which existed at that time." He then expressly conflated obligations and liabilities when he contended that "[a]t the time of the Release, it is undisputed that CDI had known of [Nies'] potential liability or obligation as CFO related to the under-reporting of withholding taxes." He repeated that contention in his opening brief and asserted that the STA "constituted

a waiver, settlement, and release of any and all claims of CDI against Nies, as a matter of law." However, in so arguing, Nies ignores the standard rules of contract interpretation which require a term that is undefined "be given its 'plain, ordinary, and popular meaning.' If a term in a [contract] is undefined, courts may look to the dictionary to determine the common meaning." *Black v. Nat'l Merit Ins. Co.*, 154 Wn. App. 674, 680, 226 P.3d 175 (2010) (footnote omitted) (internal quotation marks omitted) (quoting *Boeing Co. v. Aetna Cas. & Sur. Co.,* 113 Wn.2d 869, 877, 784 P.2d 507 (1990)). In contrast, CDI offered a dictionary definition of obligation. Specifically, CDI explained as follows in its trial brief:

> For instance, the noun "obligation" is defined to mean:
>
> 1. something by which a person is bound or obliged to do certain things, and which arises out of a sense of duty or results from custom, law, etc. 2. something that is done or is to be done for such reasons: *to fulfill one's obligations.* 3. a binding promise, contract, sense of duty, etc. 4. the act of binding or obliging oneself by promise, contract, etc. 5. *Law.* an agreement enforceable by law, originally applied to promises under seal. B. a document containing such an agreement. *Webster's Unabridged Dictionary*, Second Edition [sic].

Further, CDI argued that its interpretation reflected its intent to release Nies only from his duties under the Shareholders' Agreement. The Shareholders' Agreement contains a number of provisions that control in the event a shareholder who is not a member of the Walden family seeks or is forced to transfer their shares, including one entitled "Other Event of Transfer" which required Nies, as a non-relative shareholder, to "specify the purchase price per share" within thirty days of his resignation. That would then trigger CDI's duty under the agreement to "provide written notice to both the Offeror Shareholder [(Nies)] and the Offeree

Shareholders of whether it would 'elect to purchase or decline to purchase all or any portion of the of the Offered Shares.'"  Only then could other shareholders purchase the shares.

We agree with CDI and apply a standard dictionary definition of "obligation" to interpret the share transfer agreement.  "Obligation" as used in the STA should be defined as a "legal or moral duty to do or not do something."  BLACK'S LAW DICTIONARY 1288 (12th ed. 2024).  This definition makes it plain that the share transfer agreement operates to excuse Nies from otherwise mandatory courses of action, the ones he would be bound to follow as someone who was not a member of the Walden family as set out in the Shareholders' Agreement, in the event he sought to transfer his shares in CDI.  In contrast to the dictionary definition of "obligation," Nies' proffered synonym, "liability," is defined as the "quality, state, or conditions of being legally obligated or accountable; legal responsibility to another or society, enforceable by civil remedy or criminal punishment."  BLACK'S, *supra,* at 1095.  This is a fundamentally distinct concept from the actual word used in the STA.  To read the share transfer agreement with this substitute word, as Nies did and the trial court accepted, impermissibly rewrites it.

Another manner by which the trial court's interpretation rewrites the STA, in contravention of established contract principles, is its analysis of the function of the commas that set off the clause "pursuant to the terms of that Shareholders' Agreement, dated August 31, 1996."  On this point, after extensive consideration of restrictive and nonrestrictive clauses, the Chicago Manual of Style, and *Peters*, a case that addressed, among other things, the import of the "lowly comma," the

trial court determined that this clause "can be omitted without changing the intended meaning of the rest of the sentence." However, the omission of the clause fundamentally changes the meaning of the STA in that the cancellation of Nies' "obligations" is either restricted to those "pursuant to the terms of that Shareholders' Agreement, dated August 31, 1996" or it is limitless. Further, in dismissing CDI's position on this point, the trial court stated "CDI argues that reading the contract in this way [(without the clause)] renders the clause within the comas [sic] meaningless. *However, the clause could be read to explain the sentence that follows.*" Whether a finding of fact or a legal conclusion, this determination is not only unsupported by the record, but it is nonsensical as the STA is comprised of a single sentence. There simply is no "sentence that follows."

The trial court's interpretation of the plain language of the share transfer agreement was erroneous. Reading the clause "pursuant to the terms of that Shareholders' Agreement, dated August 31, 1996" out of the STA impermissibly rewrites it, as does the conflation of the distinct terms "obligations" as used in the STA with Nies' proffered alternative "liabilities." While there are unchallenged findings, now verities on appeal, that neither Walden nor Trivett ever intended to release Nies from any and all liability for his conduct regarding the corporate taxes, we need not even consider such extrinsic evidence to conclude that the STA is not such a waiver because, as the trial court properly found, it "was not signed by anyone representing CDI." *See Condon*, 177 Wn.2d at 164; *Boyce*, 71 Wn. App. at 663; *Retail Clerks*, 96 Wn.2d at 944. For all of these reasons, independently and especially in combination, the findings and conclusions regarding the trial

court's interpretation of the share transfer agreement, E-1 through E-5, are unsupported by the record and law and are stricken.

The document admitted in the trial court as exhibit 31, entitled "Transfer of Shares to Corporation," by its plain language relieved Nies of his obligations only "pursuant to the terms of the Shareholders' Agreement, dated August 31, 1996." By signing the STA, Nies "irrevocably convey[ed], transfer[ed], release[d], and assign[ed]" all of his CDI shares as consideration for his relief from his obligations under the Shareholders' Agreement. This interpretation is not only consistent with the express language used by the drafter, Trivett, and accepted by the sole signatory to the agreement, Nies, but also with the objective manifestation principles of contract interpretation as set out in our state's jurisprudence.

C.   Nies' Other Assignments of Error are Resolved by Proper Interpretation of STA

Our resolution of the assignment of error regarding the trial court's interpretation of the share transfer agreement resolves Nies' remaining challenges. Nonetheless, for the sake of completeness and transparency, we briefly address them and explain why that is so.

Nies contends that "the trial court erred in entering judgment against Nies and his marital community." However, this assignment of error rests on his contentions that the trial court erred when it denied his summary judgment motion and the final judgment was not supported by substantial evidence.[9] Again, we will

_____

[9] We separately note that Nies abandoned this assignment of error as he failed to offer any citation to the record or legal authority. The three conclusory sentences he presented in his brief to support this contention are insufficient to satisfy the requirements of RAP 10.3(a)(6).

not review the denial of summary judgment after a trial, and despite the trial court's erroneous interpretation of the STA, entry of judgment here was proper. The trial court determined that because the STA, which it incorrectly read as a complete "Waiver of Liability" as set out in the findings and conclusions, was void as against public policy and entered judgment against Nies on that basis. However, the propriety of the judgment entered here is unchanged by our contrary interpretation of the STA. This is so because, when viewed properly as relieving Nies of only his obligations under the Shareholders' Agreement, the STA does not operate to shield him from liability for breach of his fiduciary duties to CDI.

Nies also asserts that the trial court erred when it granted him an offset for the value of the shares he transferred back to CDI because once "the trial court voided the transfer of shares as against public policy, there could be no setoff, as the trial court concluded as a matter of law that Nies still owes the CDI shares in question on public policy grounds." While the parties devote much of their briefing on this issue to the scope of the trial court's authority to fashion equitable remedies, which include offsets, and the application of the invited error doctrine, in light of our conclusion regarding the interpretation of the STA, we need not consider such argument. Because the share transfer agreement, by its plain language, released Nies only from his obligations under the Shareholders' Agreement, it had no effect on his liability for breach of his fiduciary duties to CDI. As such, the trial court's reasoning for deeming the STA void as against public policy does not stand, and Nies is correct, albeit for reasons other than those he offered, that it was error for

the trial court to grant him an offset on that basis.[10]  We remand for the trial court to strike the offset from the judgment.

III.     Failure To Award CDI Interest on Loan

In its cross appeal, CDI avers that the trial court further erred when it declined to award as part of its damages the interest on the loan it took to pay the back taxes owed along with the resulting interest and penalties because "all of the evidence needed to calculate the $483,565.66 in interest recoverable by CDI was before the [t]rial [c]ourt" and the trial court's finding regarding its "inability to parse that figure is therefore not supported by substantial evidence."  Nies contends that CDI failed to meet its burden "to show that the trial court's determination of damages was outside the range of the substantial evidence in record."  We agree with CDI.

We do not "disturb a damages award unless the award falls outside the range of substantial evidence in the record, shocks the conscience of the court, or appears to be the result of passion or prejudice."  *Currier v. Northland Servs., Inc.*, 182 Wn. App. 733, 751, 332 P.3d 1006 (2014).  When "some findings are actually conclusions of law or mixed findings of fact and conclusions of law," we review "the factual components under the substantial evidence standard and the conclusions

---

[10] Nies also argues in briefing that while he expressly sought an offset in his amended answers and affirmative defenses, he abandoned that contention at trial.  Independent of the fact that we are prevented from reviewing this argument by his failure to provide the report of proceedings from trial, the court expressly found in E-8 that "Mr. Nies asks for "setoff" (i.e., an offset) of the value of shares transferred to CDI under the Transfer of Shares to Corporation document."  Because that finding is abandoned based on Nies' failure to provide an adequate record and apply or argue the relevant standard of review, it is a verity on appeal.  *See Jensen*, 165 Wn. App. at 105.

of law, including those mistakenly characterized as findings of fact, de novo." *In re Est. of Haviland*, 162 Wn. App. 548, 561, 255 P.3d 854 (2011).

Here, the trial court entered the following findings of fact and conclusions of law addressing the issue of damages:

> 7. Since CDI would have otherwise paid taxes and withholdings it owed as they became due, the damages proximately caused by Mr. Nies breach are those that can be attributable to the breach. This includes investigation expenses, interest, penalties, late fees, attorney fees spent on negotiating with the IRS and CRA, that are directly attributable to the failure to pay because these damages are a foreseeable result of non-payment. On the other hand, the principal amount owed to the IRS or CRA are not damages proximately caused by Mr. Nies's breach because CDI would have been responsible for those taxes without the breach.

> 8. Fees and expenses spent to refinance the debt owed for the taxes is more difficult to justify. CDI needed to refinance the debt to avoid liens and maintain business, but there was also testimony that CDI consolidated other debts into this refinance. *This [c]ourt is not able to parse out the amount of fees and interest owed on the "refinanced" debt that is attributable to Mr. Nies' breach. As such, the [c]ourt is not awarding that.*

(Emphasis added.) CDI contends that these findings are not supported by substantial evidence because the trial court admitted the exhibit it offered to address the "share of the total loan that is attributable to [Nies'] breaches, which defines the share of the principle for which interest payments are recoverable."

We first must separate these mixed findings and conclusions. Critically here, the trial court's statement that it was "not able to parse out the amount of fees and interest owed on the 'refinanced' debt that is attributable to Mr. Nies' breach," is not a finding of fact. A "fact" is "an actual or alleged event or circumstance, as distinguished from its legal effect, consequence or interpretation." BLACK'S, *supra,* at 732. In order to determine the facts of a given

case, the factfinder must "weigh the evidence and draw reasonable inferences therefrom." *Noll v. Special Elec. Co.*, 14 Wn. App. 2d 230, 237, 471 P.3d 247 (2020). As to evidence generally, the factfinder "'alone passes on a witness's credibility and measures the weight of the evidence'" in reaching its determination of facts. *In re Est. of Muller*, 197 Wn. App. 477, 486, 389 P.3d 604 (2016) (quoting *In re Est. of Palmer*, 145 Wn. App. 249, 266, 187 P.3d 758 (2008)). Here, the court could have concluded that as a matter of law, CDI failed to satisfy the relevant evidentiary burden to *prove* the amount of interest attributable to Nies' conduct or, more specifically, find that its proffered evidence was not credible. However, the court merely noting its inability to follow the figures provided in evidence that it otherwise appeared to find credible is *not* a finding of fact.

CDI's briefing clearly identifies exhibit 267 as the evidence it offered to prove this portion of its claimed damages. Exhibit 267 documents the total amount of money CDI borrowed, the portion of that loan that it used to pay to "Costs/Disbursements related to IRS/Revenue Canada," and provides specific calculations regarding the interest on only that portion of the loan, which is calculated to be $483,565.66. Further, exhibit 267 contains subsequent pages of supporting records and data to establish the figures contained on the first page. Exhibit 267 is set out in CDI's amended exhibit list, thus, the court had access to the necessary information to "parse out" only that interest directly attributable to the portion of the loan used to address the consequences of Nies' actions.

The court did not conclude that CDI *could not* establish entitlement to the interest it paid on the portion of the loan used to pay the back taxes, interest, and

penalties as a matter of law, nor did it find that the evidence CDI offered in support of that aspect of its claim for damages was not credible or insufficient.  It simply noted that it was unable to follow the math and declined to award that amount on that basis.  Trial courts have broad discretion to award damages provided that they fall within the range of evidence in the record and do not "shock[] the conscience" or result from "passion or prejudice."  *Currier*, 182 Wn. App. at 751.  "If it be the duty of the court [to assess the question of damages after trial], then it necessarily follows that the failure to do so is an abuse of direction."  *State ex rel. Brown v. Superior Court for King County*, 190 Wash. 572, 575, 69 P.2d 811 (1937).  Thus, we remand for the trial court to engage with exhibit 267 and the parties' briefing presented on reconsideration and amend the final judgment accordingly.

Affirmed in part, reversed in part, and remanded for the trial court to strike the award of offset to Nies, calculate and award as damages the portion of CDI's loan interest attributable to harm caused by Nies based on the evidence already before the court, and correct the judgment consistent with this opinion.

WE CONCUR:

Díaz, J.                          Chung, J.